## �ural𝔦chmond

## ELWOOD H. BARTLETT AND LOUISE ALDERMAN BARTLETT V. BANK OF CARROLL

September 1, 1977.

Record No. 760710.

Present: All the Justices.

C. Thomas Burton, Jr. (Hunter, Fox & Trabux, on brief), for appellants.

Stuart B. Campbell, Jr. (Campbell, Young & Hodges, on briefs), for appellee.

HARRISON, J., delivered the opinion of the Court.

Elwood H. Bartlett and Louise Alderman Bartlett, husband and wife, sought to recover a judgment against the Bank of Carroll for damages, actual and punitive, sustained by appellants as the result of the alleged wrongful dishonor by the bank of certain checks which were drawn by the Bartletts on their account. Following the introduction of all the evidence, the court struck the evidence of appellants and entered summary judgment in favor of the bank.

Clayton Hampton died in 1969 and by will devised his wife, Sadie B. Hampton, all of his property "for life, and having full confidence in her, I authorize her to use so much of the corpus of my estate as she shall find necessary for her comfort and maintenance, and at her death, whatever remains undisposed of, if any", in fee simple, to his son Griggs Hampton. After Clayton Hampton's death, an estrangement occurred between his widow Sadie and his son Griggs, who was also named in the will as executor. Mrs. Hampton began living with her grandson, Elwood H. Bartlett, and his wife, and in due time offered to sell him a

farm in Grayson County which was the principal asset of her husband's estate. The agreement between the parties was that Bartlett would take care of his grandmother, pay all her expenses and hospital bills, and give her "$50 a month to live off of and include the trailer" in exchange for the farm. They operated under this agreement for approximately two years during which Bartlett, as agreed, paid the expenses of his grandmother and also made improvements on the farm, including the construction of a barn and "quite a bit of fence".

A controversy arose over the sale of the farm to Bartlett, and there was also disagreement as to the right of the widow, under her husband's will, to dispose of his real estate. As a result, a suit was brought in the Circuit Court of Grayson County by Mrs. Hampton against Griggs A. Hampton and others to construe the will of her husband and to effect a sale of the farm to Bartlett.

On November 23, 1973, the Honorable Jack M. Matthews, judge of the lower court, approved a sale of the farm to Bartlett, the highest bidder at a public auction sale, for $72,100.00. The decree confirming the sale ordered that Bartlett recover from Sadie B. Hampton $19,453.55 for improvements that he had made to the property. The court declined to rule upon the sums of money spent by Bartlett "on the personal needs and at the personal direction" of his grandmother, and the decree recited specifically that the court did not "at this time" adjudicate what sum or sums of money, if any, remained due and owing by Mrs. Hampton to her grandson, Elwood. The court then decreed that the sum of $48,736.45, representing the net proceeds of sale after payment of costs of $3,910.00, ($68,190.00 minus $19,453.55), "be placed in a proper banking institution with instructions to pay the income therefrom to Sadie B. Hampton for her lifetime and so much of the corpus as she shall find necessary for her comfort and maintenance, and at her death to pay the remainder to Griggs A. Hampton". The decree was endorsed by James T. Ward, counsel for Mrs. Hampton, and was endorsed "seen and objected to" by Archibald A. Campbell, counsel for Griggs Hampton. Subsequently, on December 29, 1973, Campbell wrote Ward that, while he and his client still considered as excessive the amount the court allowed Bartlett for improvements, they had concluded not to appeal, and that Ward should arrange for the matter to be closed. Ward did not testify.

The next development occurred on January 3, 1974, when Ward telephoned an officer of the Bank of Carroll to inquire if the bank would be willing to accept a deposit from Mrs. Hampton of the net proceeds from the sale of the Hampton farm. The bank agreed and, pursuant to Ward's instruction, Mrs. Hampton and the Bartletts went to the offices of appellee bank in Hillsville with a copy of the November 23, 1973 decree and a check drawn by James T. Ward on his collections account at the Bank of Virginia in Galax, Virginia, payable to Sadie B. Hampton, in the sum of $48,736.45. Mrs. Hampton endorsed the check, deposited $35,736.45 in a checking account, and deposited the residue in a passbook savings account.[1] Then Mrs. Hampton wrote two checks to Bartlett, one for $17,578.53 to reimburse her grandson for expenses he had advanced for her benefit, and the other for $12,500.00, representing the purchase price of the trailer, a total of $30,078.53. These two checks were immediately deposited in the bank on a checking account by the Bartletts. At the same time Mrs. Hampton authorized the bank to withdraw $800.00 monthly, beginning January 3, 1974, from her savings account and deposit it in a savings account for the Bartletts. In accordance with this authorization the bank deposited $800.00 on January 3, 1974 in a joint savings account in the name of the Bartletts. Immediately following the deposits the Bartletts began to write checks on their account in the bank. Between January 3 and January 12, 1974, they wrote a total of 27 checks, aggregating $21,445.75, payable to personal and business creditors.[2]

On January 4, 1974, Campbell called Ward to determine when the transaction was to be closed. Ward informed Campbell that the transaction had been closed and the money paid to Mrs. Hampton the day before and deposited in the Bank of Carroll. Campbell wrote a letter dated January 8, 1974 to the bank, enclosing a copy of the November 23, 1973 decree, and advising

---

[1] The Ward check to Mrs. Hampton was routinely cleared through normal banking channels and was paid. The Bank of Virginia, Galax, Virginia, stamped "Posted" on the face of the check and the date, "Jan. 7, 1974".

[2] The bank's ledger which reflects the Bartletts' checking account shows the deposit of the Hampton checks on January 3rd and their balance on that day to be $30,078.53. As a result of checks drawn thereon, by January 4th this balance had been reduced to $30,069.40; by January 8th the balance had been reduced to $27,950.92; by January 10th to $27,885.19; and by January 11th the balance was $11,937.22.

the bank that "in the event you shall fail in executing the above provisions in the nature of a trust for her [Mrs. Hampton's] comfort and maintenance, Griggs Hampton will look to your bank for any diminution of the account".

The receipt of this letter on January 11, 1974 caused great consternation at the bank. Raleigh Cooley, one of the bank's attorneys and chairman of its board, was immediately advised of its contents and of the transfer to the Bartletts of a substantial portion of the proceeds of Ward's check to Mrs. Hampton. He was further advised of the receipt by the bank of a large number of checks which the Bartletts had written on their account, some having been posted that day. Cooley, who had no previous knowledge of the transactions, decided that the November 23rd decree envisioned that a measure of supervision would be exercised over the disbursements of the funds to Mrs. Hampton and that the bank should seek some clarification of its duties thereunder.

On January 12th, Cooley contacted Judge Matthews and was told by the judge "in no uncertain terms that he [the bank] should not pay those checks". The judge further told Cooley to take whatever steps were necessary to get the money back in Mrs. Hampton's account. Acting on advice of counsel, the bank, on January 12, 1974, refused payment and returned to the respective payees thereof eleven checks totaling $18,141.31, drawn by the Bartletts on their checking account, with the notation thereon, "alleged court contested funds" or "contested funds". The Bartletts' account was thereafter debited in the amount of $30,078.53, and Mrs. Hampton's account was credited in a like manner, thereby restoring the latter account to the status it occupied upon the deposit of Ward's check. Consistent with his oral instruction to Cooley, an order was thereafter entered by Judge Matthews directing the Bank of Carroll to hold all funds deposited in the bank from a sale of the Sadie Hampton property until further order of the court.

Following the bank's action, appellants, because of the dishonored checks outstanding, began to contact their creditors to explain what had occurred. Bartlett also took legal action to protect his interests. He had Mrs. Sadie Hampton confess judgment in his favor for $30,078.53, with interest from January 12, 1974, and had garnishment proceedings issued against the bank. The children of Mrs. Hampton sought to have the

judgment set aside and to have a committee appointed for their mother. On July 2, 1974, Mrs. Hampton and Griggs effected a compromise, and for $4,000.00 he released and quitclaimed to her his interest in the estate of his father. The lower court then decreed that Mrs. Hampton was entitled to all the proceeds from a sale of her husband's farm without restriction.

The Bartletts claim that as a result of the bank dishonoring their checks they suffered financial losses. They seek to recover damages from the bank pursuant to Code § 8.4-402, which provides as follows:

> **Bank's liability to customer for wrongful dishonor.** — A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. When the dishonor occurs through mistake liability is limited to actual damages proved. If so proximately caused and proved damages may include damages for an arrest or prosecution of the customer or other consequential damages. Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case. (Code 1950, § 6-71; 1964, c. 219.)"

Appellants contend that the Bank of Carroll was both a payor bank and a depositary bank as to the deposit they made of Mrs. Hampton's checks on January 3, 1974. They say that, having become customers of the bank, their funds were available for withdrawal as of right at the opening of the bank's second day following the receipt of the items. They rely upon Code § 8.4-213(4), which provides, in part:

> "[C]redit given by a bank for an item in an account with its customer becomes available for withdrawal as of right.

> * * *

> "(b) in any case where the bank if both a depositary bank and a payor bank and the item is finally paid, — at the opening of the bank's second banking day following receipt of the item."

Accordingly, appellants argue that since the dual status of the bank and the passing of the above deadline cannot be successfully disputed, Mrs. Hampton's checks to them were "finally paid". They cite Code § 8.4-213(1), which provides:

"An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

\* \* \*

"(d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement."

■ The Bank of Carroll was not only "the first bank to which" the checks to Bartlett were "transferred", but also "the bank by which" these checks were "payable as drawn". We find it was thus both a "depositary bank" and a "payor bank" as defined by Code § 8.4-105(a)(b).

■ Mrs. Hampton's checks to Bartlett were received by the bank on Thursday, January 3, 1974. The bank only reserved the right to "charge back any item before final payment", according to the Bartletts' deposit contract. The bank did not attempt to recover the funds represented thereby until January 12, 1974. By that time "final payment" had occurred since the statutory or "midnight" deadline, Code §§ 8.4-104(1)(h), -301(1), had expired, and the bank did not reserve the right to revoke beyond this period. J. White & R. Summers, Uniform Commercial Code, § 1604, p. 533 (1972). However, our conclusion in this respect is not dispositive of the case.

At the conclusion of all the evidence, and upon the entry of summary judgment for the bank and discharge of the jury, the trial court made certain findings of fact. It found that the Bartletts knew that the deposit made by Mrs. Hampton in the Bank of Carroll was being made pursuant to a decree of the lower court; that they knew the decree placed certain restrictions upon the holder of the fund; and that they participated with Mrs. Hampton in depositing the funds contrary to the decree of the court. It further found that the same attorney represented them and Mrs. Hampton; and that the Bartletts, although not parties to the suit brought by Mrs. Hampton against her son and other children, were aware of the rulings of the court in that case. The court concluded and held that appellants were the co-authors of their own difficulties; that while the bank did dishonor the checks drawn by appellants, it acted reasonably and seasonably in so doing; and that it did not wrongfully dishonor the checks because appellants could not take advantage of a situation of their own making.

We think the conclusion inescapable that the trial court found that the deposit of the money in the Bank of Carroll by Mrs. Hampton and the prompt transfer of a substantial portion thereof ($30,878.53 of $48,736.45) to the Bartletts, was done to circumvent and frustrate the decree of the court and the settlement which the court and counsel for the parties had arranged. It is obvious that the trial court found that the Bartletts, under the circumstances, acted in bad faith in their dealings with the bank, the court and the funds. It held therefore that appellants were not entitled as a matter of law to recover from the bank.

Clearly, the drafters of the Uniform Commercial Code were much concerned with the concept of good faith. They provided that "[e]very contract or duty within this act imposes an obligation of good faith in its performance or enforcement". Code § 8.1-203. The status of a holder in due course requires, among other things, that he take the instrument in good faith. Code § 8.3-302(1)(b). Likewise, Code § 8.3-418, on finality of payment, addresses the question of good faith, and, under the Official Comment to this section, it is said:

> "If [a transferee] has taken the instrument in bad faith or with notice he has no equities as against the drawee." (Italics supplied)

█ While Title 8.4, covering bank deposits and collections, contains no section similar to Code § 8.3-418, to read the requirement of good faith out of Title 8.4 would run contrary to established law that existed prior to the Code, as well as contrary to its manifest objectives. In *Kirby. v. First and Merchants Bank*, 210 Va. 88, 91, 168 S.E.2d 273, 275 (1969), in footnote 4, we said:

> "... U.C.C. § 4-213, which deals with bank deposits and collections, provides without qualification that a payor bank's payment of an item in cash is final. The Code recognizes, however, that a bank may recover a payment when a presenter's warranty is breached, *e.g.*, when an endorsement is forged. U.C.C. §§ 3-417 (1), 4-207 (1). And under the established law before adoption of the Uniform Commercial Code, *a bank could also recover a payment in case of fraud or bad faith on the part of the person receiving the payment. 3 Paton's Digest of Legal Opinions, Overdrafts § 4:1 (1944). ...*" (Italics supplied).

An extensive review and analysis of the *Kirby* case is found in White & Summers, Uniform Commercial Code, Sec. 16-2 (1972). On page 529, following discussion of U.C.C. §§ 3-418 and 4-213, and *Kirby*, it was said:

"The synthesis then of pre-Code cases, statutory history, and post-Code cases is that any party *not acting in bad faith* can claim the protection of 4-302 and 4-213 even though he is not a holder in due course and even though he has not changed position in reliance upon the drawee's action or inaction. . . ." (Italics supplied).

It therefore appears that Title 8.4 of the Code neither specifically addresses nor excludes recovery by a bank after "final payment" when the person receiving the credit has acted in bad faith. If we apply the general provisions of the Code, bad faith, if established, should vitiate the Bartletts' claim. If not, then this Court can resort to supplementary principles of law and equity, for Code § 8.1-103 provides, in part:

"Unless displaced by the particular provisions of this act the principles of law and equity . . . estoppel, fraud, misrepresentation . . . mistake . . . or other validating or invalidating cause shall supplement its provisions. . . ."

Thus the question becomes whether the Bank of Carroll acted "wrongfully" when it dishonored the checks under such principles. We do not comment on the evidence for there may be a retrial of this case. However, whether or not there was bad faith on the part of appellants is a matter of evidence and one for a determination by the trier of the facts, the jury. The court therefore erred in striking the evidence of appellants and entering summary judgment for the bank, thereby removing a factual issue from the jury.

■ Among the assignments of error is one which questions the action of the trial court in allowing Judge Matthews to testify. Appellants point to Code § 19.2-271, which provides that "no judge shall be competent to testify in any criminal or civil proceeding as to any matter which shall have come before him in the course of his official duties". Appellants' position is well taken. Judge Matthews should not have been allowed to testify and to explain or to interpret the meaning of the November 23, 1973 decree which he entered. We find no merit in the other assignments of error made by appellants.

For the reasons set forth in this opinion, the judgment of the lower court will be reversed and the case remanded for a new trial, if the parties be so advised.

*Reversed and remanded.*