NORTHWESTERN NATIONAL INSURANCE COMPANY OF MILWAUKEE, Wisconsin f/k/a Northwestern National Insurance Company, Plaintiff-Appellant.

v.

MIDLAND NATIONAL BANK, Defendant-Respondent.

Supreme Court

*No. 77–455. Argued February 6, 1980.—Decided May 6, 1980.*
(Also reported in 292 N.W.2d 591.)

For the appellant there were briefs by *Ray T. McCann,* attorney, and *Richard A. McDermott,* of counsel, both of Milwaukee, and oral argument by *Mr. McDermott.*

For the respondent there was a brief by *John J. Ottusch* and *Cook & Franke, S.C.,* of Milwaukee, and oral argument by *Mr. Ottusch.*

DAY, J. Northwestern National Insurance Company (Northwestern) instituted this action to recover the value of two checks totaling $49,978.20 from Midland National Bank (Midland), the payor bank. It was alleged that Midland failed to revoke a provisional settlement for the items within its midnight deadline under sec. 404.301(1), Stats. 1975,[1] and by failing to meet this deadline Midland became accountable for the value of the checks under sec. 404.302, Stats. 1975.[2] After a trial to the court, the circuit judge found that Midland missed the midnight deadline and would have been liable in the absence of a valid defense. The court held that Midland did have a defense under sec. 403.511(2)(b), because

[1] 404.301. **Deferred posting; recovery of payment by return of items; time of dishonor.** (1) Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment (s. 404.213(1)) and before its midnight deadline it:

"(a) Returns the item; or

"(b) Sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return."

[2] 404.302. **Payor bank's responsibility for late return of item.** In the absence of a valid defense such as breach of a presentment warranty (s. 404.207(1)), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of:

"(1) A demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or

"(2) Any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents."

Northwestern had no reason ". . . to expect or right to require that the instrument be accepted or paid."

The principal question presented for review is whether sec. 403.511(2)(b), Stats., is available to a payor bank as a defense to the accountability imposed for the late return of a demand item by sec. 404.302. We conclude that sec. 403.511(2)(b) is not a defense in this case and we reverse. Other issues raised by the parties will be addressed in the balance of this opinion.

I.

The basic facts underlying this controversy are not disputed.

Towne Realty (Towne), the drawer of the disputed checks, was engaged in a joint venture with two other principals as a prime contractor for a construction project at the Hill Air Force Base in Utah. Larry T. Smith, Inc. (Smith, Inc.), a construction company, was a subcontractor hired to perform concrete and utility work on the Hill Air Force Base project.

Smith, Inc., had been having financial difficulty before and during the undertaking of this contract. Northwestern was acting as a surety on a number of Smith, Inc.'s contracts. In December, 1974, Smith, Inc., notified Northwestern that it would require financial assistance in order to complete its several construction contracts. On December 17, 1974, Northwestern, Smith, Inc., Larry T. Smith, and Geraldine Smith entered into an agreement whereby Smith, Inc., agreed to deposit the funds it earned from construction contracts into an account in the Bank of Fountain Valley, Security, Colorado. The account was called "W. Robert Ward Trustee" account. W. Robert Ward was an attorney retained by Northwestern.

Although Northwestern was not a surety for Smith, Inc.'s Hill Air Force Base contract, the funds generated

from that contract were to be deposited in the W. Robert Ward Trustee account. The contract was considered a profitable one which would generate funds to enable the completion of contracts upon which Northwestern acted as a surety.

After funds were deposited in the trustee account, they were to be disbursed upon the approval of George Mueller or W. Robert Ward to the account of Smith, Inc., which was held in the same bank and to be used for such things as payroll and general operating expenses of Smith, Inc. Mr. Mueller was the claims manager of Northwestern's Denver office. Mr. Mueller and Mr. Ward acted on behalf of Northwestern and the trustee account was a vehicle to protect Northwestern's advances and status as surety for Smith, Inc.

Sometime in August of 1975, Smith, Inc., submitted a bill in excess of $100,000 to Towne Realty for work done on the Utah project. Payment was not immediately forthcoming and Larry T. Smith, the principal officer of Smith, Inc., went to Milwaukee to meet with representatives of the joint venture to urge them to pay Smith, Inc., the moneys which were claimed to be due.

On August 14, 1975, the day before Mr. Smith was to meet with representatives of the joint venture, he met with a vice president of Northwestern. Northwestern was informed by Smith that Towne Realty was losing money on the Hill Air Force Base job. A decision was made to withdraw the crews from the construction site. Mr. Mueller and Mr. Ward were advised of this decision. A memorandum was prepared of the meeting between Mr. Smith and the vice president of Northwestern. The memorandum stated in part:

". . . [T]he decision was not whether or not we should pull off the job in Salt Lake but only a matter of timing as to when. Larry had been promised another $38,000 on complete estimate No. 13 to Towne Realty (on which

he had already gotten the $50,000 partial payment) by August 20, 1975. Also a consideration is when to pull the equipment off the job since it would be nice to do this on a weekend to avoid possible attempts at attachment by Towne or Woerfel. . . . [W]e decided that we would wait and try to get as much money as we could the following weekend. Also, we decided to make one last effort to see if we couldn't force more money out of Towne Realty this week. As a consequence, Larry Smith is going to call on . . . the number two man at Towne, this afternoon and give him a pitch for the $106,000 which is currently due and owing. . . . We took into consideration the fact that Towne has been in violation of their contract—behind schedule on payment—for months and that Larry does have a valid reason for walking off the job."

Mr. Smith then met with representatives of the joint venture on August 15, 1975. As a result of this meeting, Towne Realty, Inc., issued two checks on its Hill Air Force account at the Midland bank. Each check was made payable to Larry T. Smith and Northwestern National Insurance Company. Check number 2375 was in the amount of $21,000 and check number 2376 was in the amount of $28,978.20.

The two checks were issued on August 15th and sent to Mr. Mueller in Colorado, who received them on August 20, 1975. On that day, Mr. Mueller endorsed the checks and delivered them to Mr. Smith, who also endorsed them. Mr. Smith then presented the checks at the Bank of Fountain Valley on the same day. The president of the Colorado bank was questioned as to the fastest way to collect on the checks and was told by Mr. Smith of his intention to pull the crews off the Utah job. The president of the Colorado bank then called Midland to determine whether there were sufficient funds in Towne's account to cover the checks. Midland informed him that there were sufficient funds. It was then decided that rather than submitting the checks for collection through

the federal reserve system, it would be faster to airmail them directly to Midland for collection. The Colorado bank did that on August 20, 1975.

On that same day, Smith pulled all his crews off the air force project. When Towne was informed of this action, its attorney called Midland on August 20th and issued a stop payment order on both checks. This stop payment order was subsequently confirmed in writing. Towne also sent a mailgram to Mr. Smith demanding that he continue performance on the contract at the air force base.

The stop payment order on the two checks was apparently entered into the bank's computer on the day the order was received, August 20, 1975.

On Friday, August 22, 1975, Midland received the two checks which had been airmailed by the Colorado bank. Rather than rejecting these checks, Midland held them and did not reject payment on them until Wednesday, August 27, 1975. Midland returned the checks to the Colorado bank on August 28, 1975.

A succession of errors committed by employees of Midland, described by its operations officer as "neglect" resulted in the failure to promptly implement the stop order.

W. Robert Ward, as Trustee, assigned all of his interest in the checks and any claims he might have against Midland to Northwestern. The W. Robert Ward Trustee account no longer exists.

The trial court entered the finding that the stop payment order issued to the bank was the direct result of the termination of performance by Smith, Inc., of its contract at Hill Air Force Base. The trial court also found that on August 20, 1975, Smith, Inc., and Northwestern were aware that the two checks probably would not be paid, and that Smith, Inc., and Northwestern should have reasonably expected that the "normal de-

fensive reaction of the joint venture would be to stop payment on the two checks when it found that Smith, Inc., had pulled its crews off the job." At all times relevant to this action, the Towne Realty account contained sufficient funds to cover the checks.

## II.

The check collection procedure to be followed by banks in this state is controlled by Article 4 of the Uniform Commercial Code. Sec. 404.101, *et seq.,* Stats. 1975. When a check[3] is presented for payment to a bank, a process begins whereby the check is transferred from the depositary bank, the first bank to which an item is transferred for collection,[4] to any intermediary[5] or collecting[6] banks, until the check is presented to the bank upon which it is payable as drawn. This bank is known as the payor bank,[7] which in this case is Midland. This bank may alternatively be known as the "drawer" bank. The payor bank is required to give the "presenting"[8] bank a provisional credit by midnight of the banking day of receipt of the check. The requirement that a provisional credit be given within a specified time period is not the same as the time within which the payor bank may revoke a provisional credit. This process is known

---

[3] A "check" is a draft drawn on a bank and payable on demand. Sec. 403.104(2)(b), Stats. 1975.

[4] Sec. 404.105(1), Stats. 1975. The depositary bank may also be the payor bank.

[5] An intermediary bank is any bank to which an item is transferred in the course of collection except the depositary or payor bank. Sec. 404.105(3), Stats. 1975.

[6] A collecting bank is any bank handling the item for collection except for the payor bank. Sec. 404.105(4), Stats. 1975.

[7] Sec. 404.105(2), Stats. 1975 defines a payor bank as "a bank by which an item is payable as drawn or accepted."

[8] A presenting bank is "any bank presenting an item except a payor bank." Sec. 404.105(5), Stats. 1975.

as settling for the check.[9]  R. C. Higgins and D. B. Phemister, "Article 4 Bank Deposits and Collections." *Uniform Commercial Code Handbook ABA Sec. Of Corporate Banking And Business Law* 135 (1964).

Final payment by a payor bank may occur in a number of ways set forth in sec. 404.213, Stats. 1975.[10] When a payor bank makes a provisional settlement and fails to revoke that settlement in a timely manner, payment on the check will be deemed final.  Sec. 404.213 (1) (d), Stats. 1975.

Revocation of a provisional settlement is governed by sec. 404.301(1), Stats.  This section allows revocation and the recovery of any payment if, before payment becomes final under sec. 404.213(1), and before the "midnight deadline"[11] is reached, the bank returns the

[9] Sec. 404.104(1) (j), Stats. 1975, defines settle to mean "to pay in cash, by clearing house settlement, in a charge or credit or by remittance, or otherwise as instructed.  A settlement may be either provisional or final."

[10] Sec. 404.213, Stats. 1975, provides in part:

"404.213.  **Final payment of item by payor bank; when provisional debits and credits become final; when certain credits become available for withdrawal.**  (1) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

"(a)  Paid the item in cash; or

"(b)  Settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or

"(c)  Completed the process of posting the item to the indicated account of the drawer, maker or other persons to be charged therewith; or

"(d)  Made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.

"(1a)  Upon a final payment under sub. (1)(b), (c) or (d) the payor bank shall be accountable for the amount of the item."

[11] The midnight deadline with respect to a bank "is midnight on its next banking day following the banking day on which it

item or "[s]ends written notice of dishonor or non-payment if the item is held for protest or is otherwise unavailable for return." The payor bank, Midland, readily concedes that it missed the midnight deadline.

In most cases the proper method of revoking a provisional settlement for a check presented for payment is to return the item. Sec. 404.301(4), Stats., denominates when an item will be considered to have been returned:

"An item is returned:
"(a) as to an item received through a clearing house, when it is delivered to the presenting or last collecting bank or to the clearing house or is sent or delivered in accordance with its rules; or
"(b) in all other cases, when it is sent or delivered to the bank's customer or transferor or pursuant to his instructions."

Written notice of dishonor is a permitted means of revoking a provisional settlement only where the item is unavailable for return or if it is being held for protest. *Colorado National Bank v. First Nat. Bank,* 459 F. Supp. 1366, 1369 (W.D. Mich., 1978); *Blake v. Woodford Bank & Trust Co.,* 555 S.W.2d 589, 599 (Ky. App. 1977).

The consequences attending the late return of a check are found in sec. 404.302, Stats. This section provides that in the absence of a valid defense, a payor bank is accountable for the amount of a demand item "if the bank . . . retains the item beyond midnight of the banking day of receipt without settling for it or . . . does not pay or return the item or send notice of dishonor until after its midnight deadline. . . ." Although the term accountable is not defined in the statute, it has been

receives the relevant item or notice from which the time for taking action commences to run, whichever is later." Sec. 104.104(h), Stats.

construed to impose liability for the full amount of the demand item regardless of the actual damages sustained. *Rock Island Auction Sales v. Empire Packing Co.,* 32 Ill. 2d 269, 204 N.E.2d 721 (1965); *Met Frozen Food v. National Bank Of No. Am.,* 89 Misc.2d 1033, 393 N.Y.S.2d 643 (1977); *Western Air & Refrigeration v. Metro Bank Of Dallas,* 599 F.2d 83, 85 (5th Cir. 1979). "Application of §4.302 does not depend upon whether the bank undertakes or agrees to pay the item. Strict liability follows as a matter of law." *Id.*

Midland contends that it can escape from the liability imposed by sec. 404.302, Stats., because it had a valid defense under sec. 403.511(2)(b). Sec. 403.511 provides in relevant part:

"403.511. **Waived or excused presentment, protest or notice of dishonor or delay therein.** (1) Delay in presentment, protest or notice of dishonor is excused when the party is without notice that it is due or when the delay is caused by circumstances beyond his control and he exercises reasonable diligence after the cause of the delay ceases to operate.

"(2) Presentment or notice or protest as the case may be is entirely excused when:

"(a) The party to be charged has waived it expressly or by implication either before or after it is due; or

"(b) Such party has himself dishonored the instrument or has countermanded payment or otherwise has no reason to expect or right to require that the instrument be accepted or paid; or

"(c) By reasonable diligence the presentment or protest cannot be made or the notice given."

Assuming that sec. 403.511(2)(b), Stats., could be applied to excuse any duty Midland may have had to send notice of dishonor, it does not necessarily follow that a complete defense to sec. 404.302 exists. That section requires the payor bank to "pay or return the item or send notice of dishonor." Even if the duty to send notice of dishonor was excused; the statute is phrased in

the alternative. Because one of the alternatives has been excused in a given case, does not necessarily excuse the obligation to pay or return the checks in a timely manner. *Available Iron And Metal Co. v. First National Bank Of Blue Island,* 56 Ill. App.3d 516, 371 N.E.2d 1032 (1977).

We believe that the proper analysis is to examine sec. 404.301, Stats. First it is that section which defines the appropriate procedure to be followed when revoking a provisional settlement. Under sec. 404.301, Stats., written notice of dishonor is an appropriate means of revoking a provisional settlement only when the item is held for protest[12] or is otherwise unavailable for return.[13] There has been no contention by Midland that

[12] A "protest" under the Code

". . . is a certificate of dishonor made under the hand and seal of a United States consul or vice consul or a notary public or other person authorized to certify dishonor by the law of the place where dishonor occurs. It may be made upon information satisfactory to such person." Sec. 403.509, Stats.

[13] The language "or otherwise unavailable for return" appears to be necessary in order to permit a payor bank to return the item directly to the depositary bank while sending notice of dishonor to the presenting bank. This would allow the payor bank to hold the presenting bank liable on a charge back in the event the depositary bank fails to honor the draft for reimbursement under sec. 4–212(2) of the Code. J. Clarke, *et al. Bank Deposits And Collections,* 82 (1972). The authors concede, however, that this is not clear. Sec. 4–212 of the Code is bracketed and following the text it reads:

"Note: Direct returns is recognized as an innovation that is not yet established bank practice, and therefore, Paragraph 2 has been bracketed. Some lawyers have doubts whether it should be included in legislation or left to development by agreement."

Sec. 4–212(2) has not been enacted in Wisconsin. It provides:

"§4–212. **Right of charge-back or refund** . . . [(2) Within the time and manner prescribed by this section and Section 4–301, an intermediary or payor bank, as the case may be, may return an unpaid item directly to the depositary bank, and obtain reimbursement. In such case, if the depositary bank has received pro-

the check was unavailable for return, it simply was not returned in a timely manner. In fact when the bank finally acted on the stop order, it returned the check. The obligation imposed on Midland by sec. 404.301, was to return the check to the Fountain Valley National Bank before its midnight deadline. It was not permitted to send a notice of dishonor and therefore sec. 403.511(2)(b) would have no bearing on Midland's accountability under sec. 404.302.

There is an additional reason, however, for rejecting Midland's argument for the application of sec. 403.511 (2)(b), Stats. The language "such party" in sec. 403.511 (2)(b), refers to "the party to be charged" in sec. 403.511(2)(a). The party to be charged is the party to be held liable on the instrument itself. This refers to drawers and indorsers.[14] *Available Iron And Metal Co., supra; see, Continental National Bank v. Sanders,* 581 S.W.2d 293 (Tex. Civ. App., 1979). Liability under sec. 404.302 is not premised on the instrument itself, it is based on the bank's failure to meet its midnight deadline.

visional settlement for the item, it must reimburse the bank drawing the draft and any provisional credits for the item between banks shall become and remain final.]"

[14] The official comments to sec. 403.501, Stats. delineates when presentment, notice of dishonor and protest are necessary to charge a party. The comments explain the necessary to charge language.

". . . 2. The words 'Necessary to charge' are retained from the original Act. They mean that the necessary proceeding is a condition precedent to any right of action against the drawer or indorser. He is not liable and cannot be sued without the proceedings however long delayed. Under some circumstances delay is excused. If it is not excused it may operate as a discharge under the next section. Under some circumstances the proceeding may be entirely excused and the *drawer or indorser* is then liable as if the proceeding had been duly taken. Section 3–511 states the circumstances under which delay may be excused or the proceeding entirely excused." (emphasis added). *See also,* J. White & R. Summers, *Uniform Commercial Code,* 419–423 (1972).

"We note that a payor bank is liable for its failure to meet the deadline regardless of whether the instrument was properly payable to begin with, and regardless of whether there are any actual damages shown." *Goodman v. Norman Bank Of Commerce,* 565 P.2d 372 (Okla. 1977). *See,* R. A. Anderson, *Uniform Commercial Code,* §3–511: 3 (1974 Supp. 72 fn. 11). The payees on the checks were not parties to be charged with liability in this case. They are the parties seeking to recover from the bank. The bank is not excused from liability under sec. 404.302, Stats., for the amount of the checks by virtue of sec. 403.511(2)(b), and cannot claim that the payees are parties to be charged under that section.

Professor Hawkland has described the problem which sec. 3–511(2)(b) sought to address:

"The second circumstance that, under the Code, will entirely excuse presentment or notice or protest, as the case may be, is set out in subsection 3–511(2)(b) . . . This rule has operated mainly against accommodated parties who have broken their accommodation agreements. Suppose, for example, that the indorser of a note is the principal debtor-accommodated party and that the maker of the note is, in actuality, a surety. The indorser promises to 'save harmless' the surety-maker. When the instrument is presented to the maker for payment, payment is refused. The indorser has no reason to think that the maker will necessarily pay the instrument, nor any reason to complain of lack of notice of dishonor, since, in any event, the indorser will ultimately be called upon to make payment regardless of whether the maker honors the presentment and makes payment or not. That is to say, even if the maker pays the instrument, he will seek reimbursement from the accommodated indorser. If the maker does not pay, the holder will seek payment from the indorser. Since the indorser is the party who ought to pay the instrument and can, moreover, be compelled to do so, he knows, or should know, that he will eventually be called upon for payment. It is thus that notice of dishonor, as well as presentment, is excused. The rule of subsection 3–511(2)(b) has also been involved in cases in which drawers of checks have stopped

payment. Since such a drawer is aware that the check will be dishonored, he is not entitled to complain of slow presentment or of absence of dishonor or protest." W. D. Hawkland, *Commercial Paper*, 73–74 (2d ed. 1979).

Midland argues that *American National Bank Of Powell v. Foodbasket*, 497 P.2d 546 (Wyo. 1972) is controlling. We have examined that decision and conclude that it was premised on principles of agency which imputed the employee drawer's knowledge that there were insufficient funds to pay the check to the employer payee. That decision therefore rested on grounds entirely distinct from the present case and is not relevant to the question before this court.

### III.

Midland also asserts that Northwestern was not a holder in due course and did not in good faith change its position in reliance on payment of these checks. Under sec. 403.418, Stats., it is argued that Northwestern therefore is not entitled to recover. Sec. 403.418 provides:

"403.418. **Finality of payment or acceptance.** Except for recovery of bank payments as provided in ch. 404 and except for liability for breach of warranty on presentment under s. 403.417, payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment."

Official Comment 5 by the drafters of this provision states in part:

"This section is . . . also limited by the bank collection provision (Section 4–301) permitting a payor bank to recover a payment improperly paid if it returns the item or sends notice of dishonor within the limited time provided in that section. But notice that the latter right is sharply limited in time, and terminates in any case when the bank has made final payment, as defined in Section 4–213."

This comment, when read in conjunction with sec. 3–418 demonstrates an intent on the part of the drafters of the Code to exclude the payor bank's liability provision under sec. 4–302 from the operation of sec. 3–418. "Pre-Code law, discussions of the draftsmen and others at the time of Code adoption, and post Code cases all suggest that a party does not have to be either a holder in due course or one who changes his position in order to claim the protection of 4–213 and 4–302." J. White and R. Summers, *Uniform Commercial Code*, §16–2, 526 (1972).

A final argument under the Code is made by Midland. It is asserted that Northwestern did not act in good faith and therefore recovery should be denied. Every contract or duty within the scope of the Uniform Commercial Code imposes an obligation of good faith in its performance or enforcement. Sec. 401.203, Stats. Good faith means honesty in fact in the conduct or transaction concerned. Sec. 401.201, (19). We need not address this question, because we do not perceive the indicia of fraud which Midland so strenuously asserts. The trial court made no specific finding of the lack of good faith on the part of the payee Northwestern. It is admitted that both the payees on the disputed checks knew that the contract was not going to be completed before they obtained the checks from Towne Realty. However, it has been asserted, and not sufficiently contradicted, that the checks were for work already completed by Larry Smith, Inc. We do not believe that Midland has demonstrated bad faith on the part of Northwestern or Smith, Inc. There may be a contractual dispute as to the damages sustained by Towne Realty, or whether the work was completed to satisfaction, or whether there were set off rights. But those are contract disputes and they do not concern us here. We, therefore, do not express any opinion as to the applicability of the reasoning of the Virginia Supreme Court in *Bartlett v. Bank Of Carroll*,

218 Va. 240, 237 S.E.2d 115 (1977), cited to us by Midland.

## IV.

Midland finally argues that Smith, Inc., was an indispensable party to this litigation. The statutory provision in effect at the time this action was commenced is found in sec. 260.12, Stats. 1973, which provides in part:

"260.12. **Parties united in interest to be joined; class actions; alternative joinder.** Of the parties to the action those who are united in interest must be joined as plaintiffs or defendants; but if the consent of any one who should be joined as plaintiff cannot be obtained he may be made a defendant, the reason thereof being stated in the complaint: . . ."

Noting that a cause of action under the "midnight deadline" provision of sec. 404.302, Stats., is not based on the item itself, Midland argues that the cause of action vested exclusively in the payees. As a payee Smith, Inc., "owned" the cause of action. We do not agree.

Smith, Inc., and Northwestern endorsed the checks subject to a special[15] and restrictive endorsement[16] which reads:

---

[15] A special endorsement is defined in sec. 403.204(1), Stats:

"403.204. **Special indorsement; blank indorsement.** (1) A special indorsement specifies the person to whom or to whose order it makes the instrument payable. Any instrument specially indorsed becomes payable to the order of the special indorsee and may be further negotiated only by his indorsement."

[16] The scope of a restrictive indorsement is defined in sec. 403.205, Stats.:

"403.205. **Restrictive indorsements.** An indorsement is restrictive which either:

"(1) Is conditional; or

"(2) Purports to prohibit further transfer of the instrument; or

"(3) Includes the words 'for collection,' 'for deposit,' 'pay any

"Pay to the order of the Fountain Valley Bank, Security, Colorado, for the W. Robert Ward Trustee Account—11–404–72."

When the payees[17] on the checks endorsed them, a negotiation took place.[18] Negotiation is the transfer of an instrument in such form that the transferee becomes a holder.[19] *See, The Laws Of Endorsement And Transfer Of Checks,* 78 Banking L.J. 185, 186–187 (1961). The W. Robert Ward Trustee Account became the holder[20] and could enforce the obligation of the payor bank under sec. 404.302, Stats.

Midland argues that Mr. Ward had no rights to any cause of action on the checks. It is argued, that no trust and no trustee relationship existed and that Smith, Inc. as beneficial owner was the only proper party to assign anything.

---

bank,' or like terms signifying a purpose of deposit or collection; or

"(4) Otherwise states that it is for the benefit or use of the indorser or of another person."

[17] The payees on the checks were Larry T. Smith and Northwestern. Both Smith and Smith, Inc., indorsed the checks. It is not clear in the record whether the payee was the corporation or the individual, both possessing almost identical names. The parties do not argue that there is any difference between the two and we do not address the question.

[18] It is not clear whether Smith, Inc., intended to indorse the checks in blank or subject to the special and restrictive indorsement. The effect would be the same in either case on these facts.

[19] A holder is "a person who is in possession of a document of title or an instrument or an investment security drawn issued or indorsed to him or to his order or to bearer or in blank." Sec. 401.201(20), Stats. Transfer, negotiation and the right to an indorsement are considered in secs. 403.201 and 403.202.

[20] Sec. 403.301, Stats., defines the rights of a holder. It provides:

"403.301. **Rights of a holder.** The holder of an instrument whether or not he is the owner may transfer or negotiate it and, except as otherwise provided in s. 403.603 on payment or satisfaction, discharge it or enforce payment in his own name."

We are satisfied that the agreement set up by the parties did create a trust. Although the term is not capable of being precisely defined, a trust, when not qualified by other language is generally understood to be "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it."[21] Restatement (Second) *Trusts,* sec. 2 (1959).

The agreement setting up the trust account and designating Mr. Ward, as trustee, conferred on him fiduciary duties with regard to the money deposited in the account.[22] Mr. Ward was acting on behalf of all parties to the agreement. Northwestern's advances to Smith, Inc., also went into the account. Mr. Ward and Mr. Mueller had exclusive control over the ultimate decision whether to allow disbursements from the account. Smith, Inc., had no authority to withdraw cash without obtaining the approval of Mr. Ward or Mr. Mueller. Although the beneficial ownership of a portion of the property in the account may have been in Smith, Inc., we conclude that the legal title vested in Mr. Ward as trustee.

---

[21] We do not view the trust created as falling within the definition of a business trust. A business trust "is an entity created by a declaration of trust, by the terms of which property is transferred to trustees, to be held and managed by them for the benefit of persons holding transferable certificates representing the beneficial interest in the trust estate and assets." Z. Cavitch, 3 *Business Organizations With Tax Planning,* §43.02 (1979). The trust was created to preserve property, not to carry on a business for profit.

[22] Although the Bank of Fountain Valley signed the agreement creating the trust account, it had no discretionary control over the assets in that account, except to release the funds after Mr. Ward on Mr. Mueller approved Smith, Inc.'s checks. The relation created between the bank and the account holder, the trustee, was that of debtor and creditor. 5A *Michie On Banks And Banking,* Ch. IX, §1 (1973).

There appears in the record an assignment by W. Robert Ward as trustee of this account to Northwestern of "all of his right, title and interest in the said two checks and all claims of W. Robert Ward, Trustee, against the Midland National Bank . . ." A trustee may bring suit without joining in the action the person for whose benefit the action is prosecuted. *Gulbranson-Dickinson Co. v. Hopkins*, 170 Wis. 326, 330, 175 N.W. 93 (1919). Likewise, there was nothing in the agreement limiting the trustee's right to assign property interests subject to the trust. No question has been raised regarding whether there has been a breach of the fiduciary obligations of the trustee. Simply because Smith, Inc., may have some right to a portion of the proceeds of the checks does not make it an indispensable party to this litigation. Smith, Inc.'s remedy is under the contract and not against Midland.

Smith, Inc., was not an indispensable party to this litigation under sec. 260.12, Stats.

We conclude therefore that Northwestern was entitled to recover the value of two checks in the amount of $49,978.20 from Midland.

*By the Court.*—Judgment reversed and cause remanded with directions to enter judgment pursuant to the opinion.