**Bob YEISER, d/b/a Yeiser Oil Company, Appellant,**

v.

**BANK OF ADAMSVILLE, Appellee.**

Supreme Court of Tennessee.

March 23, 1981.

James A. Hopper, Savannah, for appellant.

Terry Abernathy, Selmer, for appellee.

## OPINION

FONES, Justice.

This case involves a UCC issue of first impression in Tennessee, to wit, whether a payor bank that fails to "wire advice" of non-payment of checks of twenty-five hundred dollars or more as required by Federal Reserve Operating Letter is "accountable" for the face amount of the checks, although the checks are "returned" as contemplated by T.C.A. § 47–4–301 before its "midnight deadline."

Plaintiff, Yeiser's company, was engaged in business as the Lion Oil Distributor in Hardin, Wayne, McNairy, and Henderson Counties with headquarters in Savannah, Tennessee. R. L. Helton leased a Lion Oil Service Station in Adamsville and purchased gasoline from Yeiser for which he customarily gave a check drawn on his account at the Bank of Adamsville.

On February 20, 1978, Helton gave Yeiser a check in the sum of $5,257.78 for a delivery of gasoline. Yeiser deposited the check in his company's account at First National Bank of Savannah where it was entered into the check collection process through the Federal Reserve System and arrived at the Bank of Adamsville on February 22. Before midnight on February 23, the "midnight deadline" [1], that check was "sent" [2] to the Federal Reserve because of insufficient funds. That action of the bank was a "return of the item" in strict compliance with T.C.A. § 47–4–301. However, the Bank of Adamsville made no effort to comply with the provisions of Federal Reserve Operating Letter 9A, paragraph 18 that required "wire advice" [3] of non-payment of any check over twenty-five hundred dollars before the "midnight deadline."

On February 27, 1978, Helton gave Yeiser another check in the sum of $5,022.51. It was also deposited in the Savannah Bank and forwarded through the Federal Reserve to the Bank of Adamsville. Again the Bank of Adamsville sent notice of dishonor to the Federal Reserve within the "midnight deadline" but failed to "wire advice" of dishonor as required by the Federal Reserve Operating Letter.

Helton disappeared for a period of time, and Yeiser has not recovered any portion of the two bad checks. This suit was filed seeking a judgment for the face amount of both checks.

The trial court entered judgment for defendant and dismissed the case without any finding of fact or conclusion of law.

---

1. "Midnight deadline" with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time of taking action commences to run, whichever is later. T.C.A. § 47–4–104(h).

2. " 'Send' in connection with any writing or notice means to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed and in the case of an instrument to an address specified thereon or otherwise agreed, or if there be none to any address reasonable under the circumstances. The receipt of any writing or notice within the time at which it would have arrived if properly sent has the effect of a proper sending." T.C.A. § 47–1–201(38).

3. "Wire advice" includes telephone, telegraph, cable or any other form of electronic telecommunications.

The Court of Appeals held that defendant bank had failed to "wire advice" of dishonor of the two checks by the "midnight deadline" and thus had failed to exercise ordinary care in the handling of each of the two checks. The Court of Appeals applied the measure of damages set forth in T.C.A. § 47–4–103(5), that is "the amount of the item reduced by an amount which could not have been realized by the use of ordinary care." After an analysis of such facts as the record revealed with respect to Helton's bank account and the dealings between plaintiff and Helton, the Court concluded that Yeiser could not have collected the amount of the checks from Helton had the bank of Adamsville "wired advice" of nonpayment in accord with the Federal Reserve Operating Letter. However, the Court of Appeals failed to discuss the principal contention of the plaintiff that the measure of damages applicable for failure to wire timely notice of dishonor, as required by Federal Reserve Operating Letters, was the same as the measure of damages for failure to "send" timely notice of non-payment, as required by T.C.A. § 47–4–301, to wit, strict accountability for the amount of the check delineated in T.C.A. § 47–4–302.

Since we agree with the Court of Appeals' finding of fact that Yeiser could not have collected the two checks if defendant bank had "wired advice" of non-payment, the dispositive issue, simply stated, is whether failure to comply with the Federal Reserve Operating Letter invokes T.C.A. §§ 47–4–301 and 302 and imposes strict liability for the face amount of the checks.

The full text of T.C.A. §§ 47–4–301 and 302 is as follows:

47–4–301. *Deferred posting—Recovery of payment by return of items—Time of dishonor.*—(1) Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment (subsection (1) of § 47–4–213) and before its midnight deadline it:

(a) returns the item; or

(b) send written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.

(2) If a demand item is received by a payor bank for credit on its books it may return such item or send notice of dishonor and may revoke any credit given or recover the amount thereof withdrawn by its customer, if it acts within the time limit and in the manner specified in the preceding subsection.

(3) Unless previous notice of dishonor has been sent an item is dishonored at the time when for purposes of dishonor it is returned or notice sent in accordance with this section.

(4) An item is returned:

(a) as to an item received through a clearing house, when it is delivered to the presenting or last collecting bank or to the clearing house or is sent or delivered in accordance with its rules; or

(b) in all other cases, when it is sent or delivered to the bank's customer or transferor or pursuant to his instructions.

47–4–302. *Payor bank's responsibility for late return of item.*—In the absence of a valid defense such as breach of a presentment warranty (subsection (1) of § 47–4–207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of:

(a) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or

(b) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents.

The effect of Federal Reserve Operating Letters as agreements that may vary the provisions of the UCC are expressly dealt with in T.C.A. § 47–4–103, the text of which is as follows:

47–4–103. *Variation by agreement— Measure of damages—Certain action constituting ordinary care.*—(1) The effect of the provisions of this chapter may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.

(2) Federal reserve regulations and operating letters, clearinghouse rules, and the like, have the effect of agreements under subsection (1), whether or not specifically assented to by all parties interested in items handled.

(3) Action or nonaction approved by this chapter or pursuant to federal reserve regulations or operating letters constitutes the exercise of ordinary care and, in the absence of special instructions, action or nonaction consistent with clearinghouse rules and the like or with a general banking usage not disapproved by this chapter, prima facie constitutes the exercise of ordinary care.

(4) The specification or approval of certain procedures by this chapter does not constitute disapproval of other procedures which may be reasonable under the circumstances.

(5) The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence.

Plaintiff relies upon *Rock Island Auction Sales v. Empire Packing Company*, 32 Ill.2d 269, 204 N.E.2d 721 (1965), one of the first cases to apply UCC §§ 4–301 and 4–302 governing the liability of payor banks for the late return of "not good" demand items received through a clearinghouse. The payor bank held the check past the "midnight deadline" relying upon Empire's assurances that additional funds would be deposited, and its attempted late return of the item was clearly ineffective to revoke a provisional settlement in accord with § 4–301. The factual issue of compliance with § 4–301 and non-compliance with the "wire advice" provision of a Federal Reserve Operating Letter was not involved in *Rock Island*. Yeiser's reliance on that case and its progeny seems to rest on the proposition that failure to "wire advice" is implicitly incorporated into § 4–301 as a means of revoking a settlement because Federal Reserve Operating Letters are agreements that vary the terms of the Code, as per § 4–103(2), and that the applicable measure of damages is that set forth in § 4–302 rather than § 4–103(5).

In *Rock Island*, the payor bank was defendant Illinois National Bank and Trust Company of Rockford, and that defendant insisted that the proper measure of damages was provided in § 4–103(5) of the UCC, rather than § 4–302. The bank argued that the word "accountable" used § 4–302 meant that a payor bank need only account for what it actually had in the drawer's account, plus the damages, if any, measured by § 4–103(5). The Supreme Court of Illinois rejected that argument holding that "accountable" was synonymous with "liable" and that the plaintiff was entitled to recover the amount of the check without regard to a consideration as to its non-collectability even if the bank had met the "midnight deadline."

*Rock Island* has been followed, without dissent, by a host of cases. *See, e. g., Northwestern National Insurance Company*

*of Milwaukee v. Midland National Bank,* 96 Wis.2d 155, 292 N.W.2d 591 (1980); *Idah-Best, Inc. v. First Security Bank of Idaho, Etc.,* 99 Idaho 517, 584 P.2d 1242 (1978); *Blake v. Woodford Bank & Trust Co.,* 555 S.W.2d 589 (Ky.App.1977); *Sun River Cattle Co., Inc. v. Miners Bank of Montana N.A.,* 164 Mont. 237, 521 P.2d 679 (1974). However, the rationale of those cases provides no authority supporting the proposition that failure to comply with the "wire advice" require by a Federal Reserve Operating Letter imposes upon payor bank the same measure of damages prescribed in T.C.A. § 47–4–302 for failure to return an item or "send" notice of dishonor.

Our research has disclosed only three cases that have confronted this exact issue.

In *Bank of Wyandotte v. Woodrow,* 394 F.Supp. 550 (W.D.Mo., S.W.D.1975) the applicable Federal Reserve Operating Letter was in terms identical to the letter involved here except that "wire advice" of non-payment of any item over one thousand dollars was required. The Court applied the measure of damages prescribed in UCC § 4–103(5) reasoning that the dishonor method prescribed in UCC § 4–301 may be varied by agreements as authorized by § 4–103, which expressly includes Federal Reserve Operating Letters, and when those letters are controlling and sought to be enforced, subsection five of § 4–103 provided the appropriate measure of damages.

In *Colorado National Bank v. First National Bank & Trust Co.,* 459 F.Supp. 1366 (W.D.Mich., S.D.1978), the Court supported the application of the § 4–103(5) measure of damages for the breach of a Federal Reserve Operating Letter with a far more extensive analysis of the UCC.

As background the court gave a simplified review of the check collection procedure contemplated by the provisions of Article IV of the UCC as follows:

"The check collection process commences when a check is deposited for collection in a 'depository' bank. The process may involve a series of transfers between 'in-termediary' and 'collecting' banks. Each bank in the collection process 'settles' for the check by various means, including the payment of cash. The most common method of settlement consists of giving credit to the prior intermediary or collecting bank. § 4–201[4], Official Comment 5. Settlements are 'provisional' until 'final payment.' § 4–201. Ultimately the check is presented to the bank upon which it is drawn, the 'payor' bank, which also makes a provisional settlement with the presenting bank. § 4–213, Official Comment 4. Final payment by the payor bank 'firms up' the provisional settlements made by the intermediary and collecting banks. § 4–213, Official Comment 8.

Section 4–213 sets forth the methods by which a payor bank may make final payment:

(1) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

(a) paid the item in cash; or

(b) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or

(c) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; or

(d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.

§ 4–213.

Whether a payor bank has finally paid an item, then, depends on whether the bank executes any of the affirmative acts defined in subsections (a) to (c) of section 4–213(1). Where a bank does not act affirmatively under subsections (a) to (c), inaction, the failure to revoke a provisional settlement, constitutes final payment under subsection (d) of section 4–213(1)." *Id.* at 1368–69.

---

4. UCC section numbers are substituted for Michigan Code section numbers in the original.

See also *Blake v. Woodford Bank & Trust Co., supra,* for a history of the legal liability of payor banks for the retention of checks and the influence that practical considerations in the check collection process have had on the evolution of that law.

The methods by which a payor bank may revoke settlements, "... before it has made final payment [subsection (1) of § 47–4–213] and before its midnight deadline" are set forth in T.C.A. § 47–4–301(1). The method used to revoke the settlements in the instant case and in the *Colorado National Bank* case was the "return of the item."

The Michigan District Court found no language in the Federal Operating Circular or in Federal Reserve Regulation J, pursuant to which operating letters and circulars are issued, indicating any intent to establish "wire advice" as a means of revoking a provisional settlement, or the harsh consequence of § 4–302 upon failure to do so, and made these observations:

"First, several key terms used in the relevant UCC sections do not appear in the circular. The term 'revoke,' for example, utilized in sections 4–213(1)(d) and 4–301 which establish revocation of a provisional settlement as a means to avoid 'accountability' for the face amount of an item, is not used in Operating Circular No. 17. In addition, the term 'accountable,' the operative term in section 4–302 which imposes liability for the face amount of a check on payor banks for failure to return an item does not appear in Operating Circular No. 17.

The court also notes that the wire advice requirement imposed by Operating Circular No. 17 does not make a distinction between the liability of payor banks as opposed to collecting and intermediary banks. The circular applies to 'paying banks *and collecting banks.*' (Emphasis added). Sections 4–301 and 4–302, however, impose liability for the face amount of a check only on payor banks upon final payment." *Id.* at 1372.

The essence of the remainder of the Michigan District Court's rationale was that the primary method of revoking a settlement is the return of the item, and that "wire advice", in accord with Federal Reserve Operating Letters, was not intended as a substitute or an alternative to the "return" of an item. A fortiori, when a payor bank returns a "not good" check before its "midnight deadline," it has not made final payment, as contemplated in § 4–213, and the accountability provision of § 4–302 is not applicable.

We are satisfied that the Michigan District Court has correctly interpreted the UCC and the Federal Regulations and Operating Letters applicable to this issue.

The same issue was involved in *Whalen & Sons Grain Co. v. Missouri Delta Bank,* 496 F.Supp. 211 (E.D.Mo.1980). That Court cited *Bank of Wyandotte* and *Colorado National Bank* and held that failure to comply with the "wire advice" requirement constituted failure to exercise ordinary care invoking the measure of damages set out in § 4–103(5). After noting the absence of proof to indicate how and to what extent the failure to wire notice had harmed plaintiff's chances of collection, the court added: "The prospect of recovery due to a bank's failure to exercise ordinary care is somewhat illusory under this standard, but that is the result desired by the Code's drafters. The bank is not to be held liable for a customer's debts unless there is a clear causal relation between the bank's actions and the plaintiff's loss." *Id.* at 215.

We are convinced that the correct measure of damages for failure to "wire advice" in accord with Federal Reserve Operating Letter 9(a) Paragraph 18 is as prescribed in T.C.A. § 47–4–103(5) where the payor bank returns the check or otherwise complies with T.C.A. § 47–4–301 by its "midnight deadline."

The judgment of the Court of Appeals is affirmed. Costs are adjudged against plaintiff Yeiser.

HARBISON, C. J., and COOPER, BROCK and DROWOTA, JJ., concur.