**LAWYERS TITLE INSURANCE CORPORATION, Plaintiff,**

v.

**UNITED AMERICAN BANK OF MEMPHIS, Defendant.**

**FIRST AMERICAN TITLE INSURANCE COMPANY, Plaintiff,**

v.

**UNITED AMERICAN BANK OF MEMPHIS, Defendant.**

**Nos. 94–2870–TUA, 94–2871–TUA.**

United States District Court,
W.D. Tennessee,
Western Division.

Aug. 19, 1998.

TN, William E. Norcross, Norcross Law Firm, Cordova, TN, for United American Bank of Memphis.

John C. Speer, Stephen W. Ragland, Baker Donelson Bearman & Caldwell, Memphis, TN, for First American Title Insurance Company.

## ORDER ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

TURNER, District Judge.

Lawyers Title Insurance Corporation ("Lawyers Title") and First American Title Insurance Company ("First American") filed this action against United American Bank of Memphis ("UAB") alleging that UAB's wrongful actions caused various mortgage lenders, all of whom were insured by plaintiffs, to suffer significant financial losses. Plaintiffs, both directly and as subrogees of their insureds, seek compensatory and punitive damages as well as equitable relief under Tennessee law. Presently before the court are the defendant's motion to dismiss and the plaintiffs' motions for partial summary judgment.

### I. *Standards of Review*

#### A. *Motion to Dismiss*

When considering a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), all factual allegations of the plaintiff are to be believed and the claims must not be dismissed unless it appears that the plaintiff can prove no set of facts pursuant to his or her allegations which would entitle the plaintiff to relief. *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983), *cert. denied*, 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984); *Chartrand v. Chrysler Corp.*, 785 F.Supp. 666, 669 (E.D.Mich.1992).

Oscar C. Carr, III, Glankler Brown Gilliland Chase Robinson & Raines, Memphis, TN, for Lawyers Title Insurance Corporation.

Rebecca P. Tuttle, Steven C. Brammer, Farris Mathews Branan & Hellen, Memphis,

#### B. *Motion for Summary Judgment*

The moving party is entitled to summary judgment where no genuine issue of material fact exists and the party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When considering a motion for summary

judgment, the court's function is not to weigh the evidence or judge its truth; rather, the court must determine whether a genuine issue is presented for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law governing the case will determine what issues of fact are material. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989).

A summary judgment movant "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986). Once met, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue of triable fact. Fed. R.Civ.P. 56(e). To meet this burden, the non-movant must present sufficient countervailing evidence such that a jury could return a verdict favorable to the non-moving party. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

When relying on an affirmative defense, a defendant who is faced with a summary judgment motion has the same burden as a plaintiff against whom a defendant seeks summary judgment. That burden requires that the non-moving party with the burden of proof on the issue in question produce sufficient evidence upon which a jury could return a verdict favorable to the nonmoving party. *Id.*

## II. *FACTUAL BACKGROUND*

The claims presented in this case arise out of the actions of former Tennessee real estate attorney William Dunlap Cannon, III ("Cannon"). In connection with his real estate practice, Cannon maintained a bank account at UAB, styled "Dunlap Cannon, III, Real Estate Escrow Account II," in which he deposited funds received from various clients and mortgage lenders. These funds were to be held in trust until closing when Cannon was to disburse those funds in order to pay off existing mortgages on the lands being purchased.

Despite the escrow status of the account, Cannon proceeded to misappropriate the funds over the course of several years, using his clients' monies to pay various personal expenses. As a result of Cannon's illegal activities, the UAB escrow account was frequently overdrawn. UAB would call Cannon, often daily, to inform him that the account contained insufficient funds to cover checks he had written. UAB would allow Cannon to write new checks for which they issued accelerated or "super" immediate credit—same day credit rather than immediate credit on the next business day—thereby enabling him to cover the outstanding checks. Essentially, Cannon engaged in a check kiting scheme where he would cover insufficiencies at UAB with checks from accounts at other banks which also contained insufficient funds. Because UAB issued credit before the funds were collected, Cannon was able to float large uncollected balances.

Even with this practice, however, the account remained overdrawn on a consistent basis. In March of 1991, UAB set up a $150,000 credit line, guaranteed by Cannon's father, William Dunlap Cannon II, to be advanced as overdrafts were created in the account. Within two weeks of the issuance of this credit line, the entire $150,000 had been advanced. Despite many reports documenting the continued overdrafts in Cannon's account, the extra work required to monitor his account, and numerous threats to stop accepting uncollected checks and issuing accelerated credit, UAB considered Cannon to be a good customer who both generated large monthly fees for the bank and had outstanding personal loans. As a result, UAB continued these accommodations with respect to the escrow account.

Eventually, however, Cannon's elaborate scheme of misappropriation and check kiting unraveled. On February 3, 1994, UAB informed Cannon that it would no longer pay overdrafts or give him accelerated credit on check deposits, that it would not transfer funds between his checking accounts, and that checks drawn on his UAB accounts would only be paid if the accounts contained sufficient collected funds. Cannon's business

subsequently fell apart on February 15, 1994, and shortly thereafter, UAB closed all of Cannon's accounts. Around that time, Cannon voluntarily suspended his license to practice law in the State of Tennessee; he ultimately was disbarred by order of the Supreme Court of Tennessee effective August 1, 1994. Cannon filed a voluntary Chapter 7 Bankruptcy petition on February 25, 1994. On June 2, 1995, Cannon pleaded guilty to charges of embezzlement, mail fraud, wire fraud, and bank fraud.

Prior to the collapse of his practice, Cannon was an "approved attorney" for both Lawyers Title and First American. Because of Cannon's approved attorney status, Lawyers Title and First American issued title commitments, title insurance policies, and closing protection letters to various mortgage lenders and purchasers for Cannon's real estate closings based on Cannon's certification that he had paid the existing mortgages. When Cannon's check kiting scheme failed, numerous purchasers and mortgage lenders who were dealing with Cannon lost the funds that they had entrusted to him; as a result, Lawyers Title and First American were required to indemnify their insureds based on the title insurance commitments, policies, and closing protection letters each had issued in connection with the closings. It is these losses that they seek to recover from UAB.

## III. *PROCEDURAL BACKGROUND*

Lawyers Title and First American each filed this action against UAB on October 26, 1994. Given the similarity of the allegations, issues, and facts in the two cases, this court consolidated the actions by order on February 3, 1995.[1] The plaintiffs seek to recover from UAB the monies paid pursuant to the closing protection letters and title insurance policies under various theories. Essentially, their arguments rest on the assertion that UAB had actual knowledge that Cannon was misappropriating funds from the escrow ac-

count and that UAB aided Cannon in his misappropriation. Lawyers Title and First American assert that UAB engaged in such conduct in order to continue receiving the monthly transaction fees generated by Cannon's account, which were among the largest at the bank, and because Cannon had large outstanding loans at UAB that the bank wanted to recover. Furthermore, the plaintiffs assert that Cannon received this special treatment because he was married to Derenda Cannon, niece of William B. Tanner who was then owner of all the voting stock in the holding company which owns UAB.

Specifically, the plaintiffs have alleged claims of aiding and abetting; violation of § 47–3–304 of the Tennessee Code Annotated; unjust enrichment and restitution; constructive trust; and money had and received. Additionally, Lawyers Title asserts a claim for the late return of certain checks in violation of § 47–4–302 of the Tennessee Code Annotated.

UAB filed a motion to dismiss the plaintiffs' complaints on November 29, 1995. UAB asserts that the aiding and abetting claim should be dismissed because UAB owed no duty to the plaintiffs. UAB also asserts that the plaintiffs' claim for punitive damages should be dismissed because, as subrogees, they lack standing to assert such a claim. The defendant moves to dismiss the claims based on Tenn.Code Ann. § 47–3–304 because Cannon was not a fiduciary vis-á-vis UAB, or, in the alternative, because UAB was not a "purchaser" of checks payable to third parties. Additionally, UAB contends that the claims for unjust enrichment, constructive trust, restitution, and money had and received should be dismissed because UAB did not wrongfully retain money belonging to plaintiffs, was not in privity with the plaintiffs, and was properly owed all money received. Finally, UAB asserts that Lawyers Title's claim for violation of Tenn. Code Ann. § 47–4–302 should be dismissed

---

1. Jurisdiction over this case is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332. Lawyers Title is a Virginia corporation with its principal place of business in Richmond, Virginia; First American is a California corporation with its principal place of business in Santa Ana, California; and UAB is a federally insured state

banking corporation chartered under the laws of the State of Tennessee with its principal place of business in Memphis, Tennessee. Additionally, the matter in controversy exceeds $50,000. (At the time this action was filed, 28 U.S.C. § 1332 had not yet been amended to raise the amount in controversy requirement to $75,000.)

for lack of standing because, as a subrogee and assignee, Lawyers Title does not have standing to assert such a claim.

On November 29, 1995, Lawyers Title and First American filed motions for partial summary judgment with respect to UAB's liability to the plaintiffs, and with respect to UAB's liability and resulting damages to Lawyers Title for violation of the midnight deadline under Tenn.Code Ann. § 47-4-302. In response, UAB contests the plaintiffs' use of "undisputed facts," and asserts that highly disputed factual issues exist that render summary judgment inappropriate, including whether the plaintiffs are entitled to subrogation. Additionally, with respect to each of the plaintiff's claims, UAB reasserts the arguments contained in its motion to dismiss.

## IV. PRELIMINARY CONSIDERATIONS

### A. Plaintiffs' Right to Subrogation

In its response to plaintiffs' motions for partial summary judgment, UAB asserts that summary judgment is inappropriate in the instant action because issues of fact exist regarding the plaintiffs' right to subrogation. Specifically, UAB asserts that a jury must determine whether the plaintiffs were sufficiently negligent so as to bar application of subrogation principles and the plaintiffs must establish that the equities are in their favor. In response, the plaintiffs argue that they are pursuing a claim for conventional subrogation rather than equitable subrogation and, as a result, a balancing of the equities is not required. Furthermore, the plaintiffs assert that with respect to the intentional tort of aiding and abetting, any negligence on the plaintiffs' part would not be a defense.

■ In Castleman Constr. Co. v. Pennington, 222 Tenn. 82, 432 S.W.2d 669 (1968), the Supreme Court of Tennessee discussed the equitable nature of subrogation: "To entitle one to subrogation, his equity must be strong and his case clear, since it will not be enforced where the equities are equal, or the rights are not clear, or where it will preju-

dice the legal or equitable rights of others." Id. at 675 (quoting Couch on Insurance 2d, Subrogation § 61:21). Additionally, the court found the distinction between conventional and legal subrogation [2] to be as to the source of the right, and stated that "regardless of the source of the right of subrogation, the right will only be enforced in favor of a meritorious claim and after a balancing of the equities." Id. at 676. Therefore, the plaintiffs' contention that an inquiry into the respective equities is unnecessary in the instant case is incorrect; regardless of the source of the plaintiffs' asserted subrogation rights, a balancing of the equities is required to determine whether the plaintiffs are in fact entitled to be subrogated to their insureds' claims.

■ Relevant to the equitable balancing is the degree of negligence, if any, of the party asserting a claim for subrogation. The Castleman court noted that a party's culpable negligence may bar subrogation rights, although ordinary negligence, mistakes, and ignorance will not. Id. at 676 (citing 83 C.J.S. Subrogation § 6). Thus, "where the mistake is wholly caused by the want of that care and diligence in the transaction which should be used by every person of reasonable prudence, and the absence of which would be a violation of a legal duty, a court of equity will not interpose its relief." Id. at 677 (quoting Dixon v. Morgan, 154 Tenn. 389, 285 S.W. 558 (1926)). However, "ordinary negligence alone will not be held as a complete bar to subrogation where in spite of such negligence the equities are still in favor of the subrogee." Id.

■ UAB points to several factors which, it contends, prevent the plaintiffs from being entitled to subrogation: the plaintiffs concede they had no minimum standards for approved attorneys and did no background check before granting that status; the plaintiffs concede that misappropriation by an approved attorney is a known risk; Cannon had numerous recorded judgments and tax liens filed against him; the plaintiffs' increased

2. Conventional subrogation is that "which arises from a contract or agreement," Tennessee Farmers' Mut. Ins. Co. v. Rader, 219 Tenn. 384, 410 S.W.2d 171, 173 (1966), whereas legal subroga-

tion is that "which arises by operation of law based on general principles of equity and justice." Wimberly v. American Cas. Co., 584 S.W.2d 200, 203 (Tenn.1979).

business with Cannon in 1992 and 1993 should have put them on notice as to Cannon's illegal activity; three other title companies in Memphis either stopped doing business with Cannon or required him to use a special escrow account; and the plaintiffs knew that Cannon was a shareholder in Stewart Title Company which should have made the plaintiffs suspicious about the increase of business. UAB also avers that Lawyers Title had notice that Cannon might have been misappropriating funds through a call report by Robert Applebaum ("Applebaum"), a sales representative of Lawyers Title, documenting a conversation with Phil Kaminsky and Mike Hewgley in which Hewgley voiced a suspicion that Cannon had intentionally not paid the mortgage for one of his closings and pocketed escrow funds.[3] No follow-up investigation was conducted.

In response to UAB's assertions regarding knowledge of Cannon's misappropriation, Lawyers Title and First American assert that the increase in business in 1992 and 1993 was not suspicious because it was due to lower interest rates and, at that time, the title companies each did business with new attorneys. The plaintiffs also point to the fact that UAB offers no evidence that Lawyers Title or First American knew that other title companies stopped doing business with Cannon or required him to use a special account; rather, UAB merely asserts that the plaintiffs were likely to know because of the interconnection between the title companies. Lawyers Title also disputes UAB's reliance on Applebaum's call report because there is no evidence that Applebaum shared that report with anyone, and furthermore, he retired in November of 1991, a year and a half after writing that report, and before the increased business with Cannon in 1992 and 1993.

UAB's assertions fail to establish that either Lawyers Title or First American had actual knowledge of Cannon's misappropriation of funds. For example, the fact that the plaintiffs experienced an increase in business with Cannon in 1992 and 1993 in the face of lower interest rates does not give notice of improper conduct with respect to the escrow account. Additionally, there is no evidence that either plaintiff had knowledge of other title companies' policies with respect to Cannon, or that those policies were instituted as a result of improper conduct by Cannon. Indeed, it seems apparent that neither plaintiff had actual knowledge of Cannon's misappropriation. The plaintiffs each issued title insurance policies and closing protection letters in reliance on Cannon's assertions that he was disbursing the money as required; his failure to handle the money appropriately would expose the plaintiffs to significant financial liabilities. Any actual knowledge of misappropriation would have most likely ended the relationship between the plaintiffs and Cannon.

Thus, at most, UAB's assertions raise the possibility that the plaintiffs were negligent in their dealings with Cannon and risked liability to its insureds by failing to have minimum standards for its approved attorneys and failing to do a background check on Cannon despite the known risk of misappropriation by closing attorneys. This negligence in seeking out such information, however, is insufficient to bar, as a matter of law, the plaintiffs from being subrogated to the insureds' claims against UAB. *See Castleman*, 432 S.W.2d at 676–77 (finding that title company was subrogated to insureds' claim despite the company's negligence in failing to discover defects in title); *Shelby Mut. Ins. Co. v. Clark–Holmes, Inc.*, 57 Tenn.App. 42, 414 S.W.2d 650, 655 (1966) (granting relief to insurance company by way of subrogation despite agent's negligence in failing to demand issuance and delivery of policy prior to accident at issue) (citing *Dixon v. Morgan*, 154 Tenn. 389, 285 S.W. 558 (1926)). Furthermore, any negligence on the part of the plaintiffs injured themselves and did not prejudice the bank. *See Dixon*, 154 Tenn. at 404–05, 285 S.W. 558 ("All negligence, to be culpable, necessarily implies the failure to perform some duty .... It is not a failure of duty to one's self, but to another, that constitutes culpable negligence."). *Compare Cas-*

---

3. In their depositions, neither Kaminsky nor Hewgley remembered the conversation; Applebaum remembered it only vaguely.

*tleman,* 432 S.W.2d at 676–77 (finding the plaintiff entitled to subrogation despite negligence in failing to discover title defects) *with Old Nat'l Bank v. Swearingen,* 167 Tenn. 529, 72 S.W.2d 545, 548–49 (1934) (finding that bank acting as guardian for minor children was guilty of culpable negligence precluding subrogation where bank lent its wards' money secured by property with defective title, which would have been disclosed by a casual inspection of the title) (distinguishing *Dixon*). Accordingly, even if found to be negligent based on UAB's assertions, the plaintiffs were not sufficiently negligent to preclude them from subrogation as a matter of law.

■ In light of the foregoing, it is necessary to determine whether the balance of equities lies in favor of the plaintiffs, entitling them to subrogation. *See Castleman,* 432 S.W.2d at 677 ("We do not say that ordinary negligence of the subrogee cannot be taken into consideration in ascertaining whether he be entitled to the equitable relief of subrogation. What we do say is that ordinary negligence alone will not be held as a complete bar to subrogation where in spite of such negligence, the equities are still in favor of the subrogee."). Essentially, the plaintiffs' basis for subrogation, as well as for their claims against UAB, is that UAB had knowledge that Cannon was misappropriating funds in breach of his fiduciary duty. If such knowledge is found to exist, the equities could be found to lie in the plaintiffs' favor, despite the alleged negligence on their part. *See Castleman,* 432 S.W.2d at 678–79 (finding that despite the plaintiff's negligence, the defendant's "want of care and diligence ... demands that the equity" would not prevent the plaintiff from being subrogated to the claims). If, however, UAB is found to be an innocent party with respect to Cannon's misconduct, the balance of equities might weigh against the plaintiffs. *See Bank of Fort Mill v. Lawyers Title Ins. Corp.,* 268 F.2d 313, 315 (4th Cir.1959) ("[I]t is the general view that a paid surety has fewer equities than an innocent bank, since the surety company is

paid to assume the specific risk."). Accordingly, a question of fact exists as to the balance of the equities, and the court cannot determine as a matter of law whether the plaintiffs are entitled to subrogation.

B. *Affidavits Submitted in Opposition to Motion for Summary Judgment*

■ In response to the plaintiffs' motions for summary judgment, UAB submitted several affidavits,[4] all of which essentially state that the affiants had no knowledge of Cannon's misappropriation of funds from the escrow account. The plaintiffs contest consideration of these affidavits for the purposes of this motion, asserting that the affidavits contradict prior sworn testimony and therefore cannot be used to create an issue of fact for trial.

■ "[I]t is 'accepted precedent' that after a motion for summary judgment has been filed, thereby testing the resisting party's evidence, a factual issue may not be created by filing an affidavit contradicting earlier deposition testimony." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1352 (6th Cir.1991) (quoting *Gagné v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 315 (6th Cir.1989)). The affidavits submitted by UAB, however, do not squarely contradict the prior testimony of the affiants. Throughout the affiants' deposition testimony, those individuals admitted that they experienced problems with the Cannon account due to his continuous overdrafts; nevertheless, they either maintained that they did not know of any misappropriation or did not testify regarding their knowledge of misappropriation. In fact, the depositions do not clearly reveal what the knowledge of each deposed person was. Thus, the affidavits do not contradict the depositions; the fact that they were filed for the purpose of opposing summary judgment bears on the overall credibility of those affidavits, but does not bar them from being considered. *See Kelly v. BASF Corp.,* No. 95–1851, 1997 WL 137382, at *6 (6th Cir. Mar.25, 1997) (considering affidavits filed in response to a motion for summary judgment

---

4. These affidavits include those of Barry G. Smith, Kay C. Hill, Thomas L. Lamb, John R. Koch, Martin A. Grusin, and David E. Browning.

where there was "no substantial contradiction" with the prior deposition when "read as a whole").

■ The plaintiffs also argue that the affidavits should not be considered because they contradict UAB's sworn answers to garnishments issued on Cannon's escrow account in which UAB refused to garnish the account due to the account's escrow status. This argument fails for two reasons. First, the affidavits all address the affiants' knowledge of Cannon's misappropriation rather than discussing the escrow status of the account and thus do not contradict the garnishment answers. Second, Thomas Lamb's statement that the bank had no heightened duty with respect to the escrow account and had to "honor his disbursements as with any other demand deposit account," (Aff. of Thomas L. Lamb, Jan. 16, 1996), and similar statements by Martin Grusin, (Grusin Aff. at 3), do not contradict the garnishment answers. Restricting third parties' access to funds in an escrow account is significantly different from monitoring a fiduciary's conduct with respect to checks drawn on an escrow account.

■ Additionally, the plaintiffs contend that the personal statements of the affiants are insufficient to support UAB's claim that it did not know of Cannon's misappropriation and argue that "knowledge of UAB, as a corporate entity," has been established. The court questions how the plaintiffs would expect UAB to have knowledge other than through the individuals who work for the bank; indeed, the only way for UAB to obtain such knowledge is through those individuals. Thus, these statements, made by executive officers and employees of UAB who dealt with Cannon and the account, bear on whether UAB had knowledge of the illegal activity with respect to account funds. Accordingly, the court finds the plaintiffs' arguments to be without merit. The affidavits

are appropriate for consideration in connection with the motion for summary judgment.[5]

## V. DISCUSSION

### A. Aiding and Abetting

Lawyers Title and First American allege that UAB is liable for aiding and abetting Cannon's misconduct because UAB had actual knowledge that Cannon was misappropriating funds from the escrow account and UAB provided substantial assistance which enabled Cannon to do so. UAB responds that it owed no duty to the plaintiffs, and therefore seeks to dismiss the claim for aiding and abetting. Furthermore, UAB asserts that summary judgment is inappropriate because its actions were insufficient to constitute substantial assistance and because the claim is highly factual.

Tennessee has adopted the Restatement of Torts § 876(b) theory of aiding and abetting, under which the plaintiff must show that "the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts." *Cecil v. Hardin*, 575 S.W.2d 268, 272 (Tenn.1978) (citing *Restatement of Torts* § 876(b)). Liability in such cases is "distinct from that which imposes liability on the basis that the parties participated in a joint venture." *Id.* Under this theory of aiding and abetting, "an individual who participates in an unlawful activity in concert with others is liable for any damages resulting from acts committed by his compatriots in the course of that activity." *Id.*

■ Contrary to UAB's arguments, Tennessee law does not impose liability for aiding and abetting based on a duty between the defendant and plaintiff. Rather, the cause of action is much broader, imposing liability if "the defendant knew that his companions' conduct constituted a breach of

5. The plaintiffs assert that Thomas Lamb's statement in his affidavit that he never suspected Cannon of check kiting contradicts deposition testimony that policies were instituted with respect to the escrow account out of concern for or to prevent the possibility of check kiting. (Lamb dep. at 27, 34, 38, 176). Although Lamb's testimony does not indicate that he was certain there was a kite, it does suggest that he considered the

possibility. His affidavit statement that he never suspected Cannon of check kiting and that action was taken with respect to the account simply out of concern about his "sloppy business habits" conflicts with his testimony that there were red flags as to the possibility of a kite and his motivations to avoid such a possibility. Thus, the court will not consider this portion of Lamb's affidavit for purposes of this motion.

duty." *Hardin*, 575 S.W.2d at 272. That is, under § 876(b), the defendant need not owe a duty to the plaintiff, but rather, must know that a third party owes a duty to the plaintiff. *See GCM, Inc. v. Kentucky Central Life Ins. Co.*, 124 N.M. 186, 947 P.2d 143, 147–48 (1997) (recognizing tort liability for aiding and abetting a breach of fiduciary duty, discussing *Restatement of Torts* §§ 876 and 874, and stating that "[a]n injured party need not have a direct relationship with the third party against whom liability is sought as an aider and abettor. Rather the injured party must have a fiduciary relationship with the principal tortfeasor, and the third party must occupy the role of an accomplice in relation to the principal tortfeasor"); *Becks v. Emery–Richardson, Inc.*, Nos. 86–6866, 87–1554, 1990 WL 303548, at *45 (S.D.Fla. Dec. 21, 1990) (finding that the defendants owed no fiduciary duty to the plaintiffs, but genuine issues of fact existed as to the defendants' liability as an aider and abettor of other defendants' breach of fiduciary duty to plaintiffs); *see also Williams v. Bank Leumi Trust Co.*, No. 96–Civ–6695, 1997 WL 289865, at *5 & n. 3 (S.D.N.Y. May 30, 1997) (considering a claim for aiding and abetting breach of fiduciary duty where court also found that alleged aider and abettor itself owed no fiduciary duty). *Compare Restatement (Second) of Torts* § 876(c) (1977) (discussing liability for substantially assisting another to accomplish a tortious act where the aider's own conduct, "separately considered, constitutes a breach of duty to the third person"). Thus, in order to state a claim for aiding and abetting, the plaintiffs must allege underlying wrongful conduct by Cannon, of which UAB knew and substantially assisted.

### 1. *Subrogated Claim of Aiding and Abetting*

■ There is no dispute that Cannon was a fiduciary with respect to the plaintiffs' insureds and that Cannon breached his fiduciary duty by misappropriating their funds. This breach of fiduciary duty to the plaintiffs' insureds would provide the basis for a subrogated claim of aiding and abetting against UAB if UAB had knowledge of the breach and substantially assisted Cannon. The plaintiffs have alleged that UAB knew of Cannon's misappropriation due to the frequent overdrafts in the account and checks written for Cannon's personal expenditures. They also allege that the banks' acts of issuing accelerated credit, allowing Cannon to cover overdrafts, and extending a line of credit to cover overdrafts substantially assisted Cannon in his misappropriation. In light of these allegations, the plaintiffs have sufficiently stated a claim for aiding and abetting under a subrogation theory to survive the defendant's motion to dismiss that claim.[6] The court will thus consider the plaintiffs' motions for summary judgment with respect to the subrogated claim.

#### a. *Breach of Duty*

As noted above, it is undisputed that Cannon breached his fiduciary duty to the insured by misappropriating their escrow funds.

#### b. *Knowledge of Breach of Duty*

Tennessee courts have not yet ruled as to whether actual knowledge is required to establish aider and abettor liability under § 876. Other courts applying § 876, however, have required a showing that the aider and abettor had actual knowledge of the primary tortfeasor's wrongdoing. *See Stat–Tech Liquidating Trust v. Fenster*, 981 F.Supp. 1325, 1339 (D.Colo.1997) ("[L]iability for aiding and abetting a common law tort may only be imposed on those who knew that the tort was being committed and who understood in a general sense what their role was in conjunction with the tortious activity.... [Acting] negligently or recklessly is not sufficient to meet the mental state element of a claim for aiding and abetting a common law tort."); *Williams v. Bank Leumi Trust Co.*, No. 96–6695, 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997) (stating that "New York courts require actual knowledge of the primary wrong by the alleged aider and abettor" and that "constructive knowl-

---

6. In reaching this conclusion, the court has assumed for the purposes of these motions that the plaintiffs are entitled to subrogation. As discussed, *supra*, this is an issue that must be determined at trial.

edge ... is insufficient to state a claim for aiding and abetting") (citing *Kolbeck v. LIT Am., Inc.,* 939 F.Supp. 240, 246 (S.D.N.Y. 1996)); *Future Group, II v. Nationsbank,* 324 S.C. 89, 478 S.E.2d 45, 50 (1996) (rejecting a claim of aiding and abetting a breach of fiduciary duty because defendant's lack of actual knowledge prevented knowing participation in the breach).

■ "The gravamen of a claim of aiding and abetting a breach of fiduciary duty is the defendant's 'knowing participation' in the fiduciary's breach of trust; wrongful intent is not necessary as the fact finder is required only to 'find that the [defendant] knew of the breach of duty and participated in it.' " *Holmes v. Young,* 885 P.2d 305, 309 (Colo.Ct. App.1994) (quoting *S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 848 (2d Cir.1987)) (alteration in original); *see S & K Sales,* 816 F.2d at 848 (finding that it was not error to refuse to instruct jury that wrongful intent is an essential element of the tort of participation in a breach of fiduciary duty (citing *Restatement (Second) of Torts* §§ 874, 876(b)); *Ezzone v. Riccardi,* 525 N.W.2d 388, 398 (Iowa 1994)) (distinguishing between conspiracy under § 876(a) which "must involve some mutual mental action coupled with an intent to commit the act that causes injury" and aiding and abetting under § 876(b), for which there must merely "be a wrong to the primary party, knowledge of the wrong on the part of the aider, and substantial assistance by the aider in the achievement of the primary violation"). The foregoing authority and the language of § 876(b) indicate that actual knowledge of the third party's wrongful conduct is required to establish aider and abettor liability.

■ The plaintiffs claim that UAB had actual knowledge that Cannon was misappropriating funds. Their allegations are based on the escrow status of the account and Cannon's use of checks drawn on that account for personal expenditures, including payments on his personal loans to UAB, payments to J.C. Bradford & Co. for commodity trades, and a payment to Southern Methodist University for his daughter's college tuition, as well as payments to his wife and various companies, some of which belonged to Cannon. Each of these transactions, the plaintiffs assert, provided UAB with actual knowledge that Cannon was misappropriating funds in breach of his fiduciary duty. Plaintiffs rely heavily on a comment by David E. Browning, the loan officer assigned to Cannon's account, that Cannon was "fooling around" within the account. Additionally, the plaintiffs point to repeated warnings given to Cannon and threats to take away his account privileges, documented in "call reports," as evidence that UAB knew of Cannon's misappropriation which was causing problems with the account.

UAB contends that it had no knowledge that Cannon was diverting funds from the account, but rather only knew that despite frequent overdrafts, Cannon was always able to cover the shortages the next day. UAB claims that Cannon provided an explanation for the overdrafts to the effect that he often did not receive the funds until after closing, and that he just needed an extra day or so to cover them. Additionally, UAB refutes any knowledge based on Cannon's withdrawals for personal expenses because if Cannon's fees were deposited into that account, he could write checks to his benefit. (Browning dep., July 21, 1994, at 198; *see also* Grusin Aff. ¶ 4).

The depositions taken in connection with this case are extensive, and a review of them indicates that UAB had knowledge of the continual overdraft problems with respect to Cannon's account. UAB threatened to terminate the special accommodations being given to Cannon more than once, and he was repeatedly told to change his practices with respect to the account. Furthermore, in light of the hand-written checks for personal expenditures, as opposed to the machine-generated checks drawn in connection with a closing, the checks and transfers of funds applied to Cannon's loans at UAB, as well as the continual overdrafts, the plaintiffs have offered evidence which could show that UAB had actual knowledge of misappropriation.

Nevertheless, UAB asserts that despite the overdraft problems, it did not know Cannon was misappropriating funds. In fact, reading Browning's comment that Cannon was "fooling around" in the account, upon

which the plaintiffs heavily rely, in context, it seems more likely that he was referring to overdrafts in the account rather than misappropriation of the funds by Cannon. (Browning dep., July 21, 1994, at 38–39). Furthermore, UAB, relying on a statement by its expert witness, Mr. Paul Carrubba, summed up its defense as follows:

> Hindsight is twenty twenty. You can sit back here and look at transactions that went to an account and say, well, golly, look at this, look at what happened here, ... somebody should have seen that stuff. But when you go through and you look at how these transactions are actually handled on a daily basis, you are not going to find any one person that is, for one thing, going to see all of those things. Unless you are specifically looking for something, those things that may seem apparent now are not so apparent as they are occurring, as things are happening.
>
> It just appears to me that what happened in this situation is that the bank has a customer, that, yes, they bent over backwards in some of the things that they did in allowing him to make his deposits on a daily basis, and it is a pain to keep up with a customer like that, but to say that the bank should have drawn inferences and this should have been red flags that this man is stealing money, I don't agree with that.

(UAB's Resp. to Pls.' Mot. for Summ. J. at 9 (quoting Carrubba dep. at 195–96)). While Cannon's illegal activity is obvious now, it may not have been evident to the various individuals who, at different times, dealt with the account. Given Cannon's explanation for the delays, UAB might not have known that Cannon was breaching his duty despite the frequent overdrafts and checks written for personal expenses. *See Chambers v. First Trust & Sav. Bank,* No. 030A1–9108–CH00293, 1992 WL 40191, at *3 (Tenn.Ct. App. Mar.4, 1992) ("A bank in which a fiduciary carries a trust account has no duty to administer the account or supervise its administration, but may pay checks regularly drawn on the account on the presumption that the fiduciary is acting honestly and properly administering the funds unless cir-

cumstances are such to put the bank on notice that the fiduciary is misappropriating or intends to misappropriate funds. What is sufficient to put the bank on notice depends on the particular facts and circumstances of each case."); *Tubbs v. United Central Bank,* 451 N.W.2d 177, 183 (Iowa 1990) (stating that a bank's knowledge of a customer's "illiquid" position for over a year "does not necessarily mean that [the bank] knew that fraud or other tortious acts were being committed"); *Lawyers Title Ins. Corp. v. Frontier Title Co.,* No. 87–10872, 1989 WL 44186, at *5 (N.D.Ill. Apr.24, 1989) (finding a question of fact regarding bank's knowledge of misappropriation where bank could assume that diverted funds belonged to the fiduciary and bank closed fiduciary's accounts upon learning of the alleged misappropriation). Therefore, a genuine issue of fact exists as to whether UAB had actual knowledge of Cannon's misappropriation.

### c. *Substantial Assistance*

█ The plaintiffs assert that because Cannon would have not been able to engage in his misconduct without the special accommodations provided to him by UAB, UAB's actions constituted substantial assistance to Cannon's misappropriation. In particular, the plaintiffs assert that UAB's practices of issuing super-immediate credit on checks deposited by Cannon, alerting him to overdrafts in the account, extending personal loans to Cannon to cover overdrafts in the account, extending such loans without following the bank's standard procedures, and issuing a $150,000 line of credit to be advanced against overdrafts were essential factors that enabled Cannon to misappropriate millions of dollars from the escrow account over the course of several years and caused the plaintiffs' losses. Additionally, the plaintiffs allege that UAB wrote to the Tennessee Board of Professional Responsibility on Cannon's behalf, thereby affirmatively aiding in covering up his breach of fiduciary duty. The plaintiffs suggest that UAB was motivated to assist Cannon because UAB wanted to collect Cannon's large outstanding loan, as well as the fees generated by his account.

In determining whether the defendant's conduct provided substantial assistance to

the wrongdoer, "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the fact, his relation to the other and his state of mind are all considered." *Restatement (Second) of Torts* § 876 comment on clause (b). Other courts faced with facts similar to those presented in the instant case have found that, as a matter of law, a bank's provision of flexible banking services and a line of credit are insufficient to constitute substantial assistance, even if those actions have the effect of enabling a fiduciary to misappropriate funds in breach of his or her duty. *See Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 671–72 (S.D.N.Y.1996) (dismissing plaintiffs' claims for aiding and abetting where the defendant bank extended generous overdraft, permitted the customer to draw against uncollected funds, and extended personal credit to the wrongdoer, despite indications of check kiting, because providing services on flexible terms in order to generate fees was insufficient to establish substantial assistance); *see also Glidden Co. v. Janderoa*, 5 F.Supp.2d 541, 557 (W.D.Mich.1998) (rejecting a claim for aiding and abetting based on the bank's financing of a management group's undertaking despite the bank's knowledge that the group was breaching its fiduciary duty and committing fraud, finding "no authority for holding a bank liable for financing a client's business undertaking on the basis that the client might be engaged in fraud or breaches of fiduciary duty" and finding that "[a] bank cannot be held liable for aiding and abetting fraud or breach of fiduciary duty merely on the basis that it knew the party it was lending money to was not being forthright in its dealing with others"); *Patton v. Simone*, Nos. 90C–JA–29, 90C–JL–219, 1992 WL 183064, at *10–12 (Del.Super.Ct. June 25, 1992) (rejecting a claim that a bank aided and abetted a company that maintained an unsafe elevator which resulted in injury by loaning money to the company despite the bank's knowledge of the condition, because "[the bank's] interest was to keep [its customer] which would mean he would be paying interest to the bank, the source of the bank's income. Aider and abettor liability

may not be imposed where the bank's intention was for legitimate business reasons").

Despite the foregoing, the court finds that the plaintiffs have alleged conduct sufficient to raise a question of substantial assistance. Most importantly, the plaintiffs allege that UAB knowingly honored checks drawn on the escrow account in breach of Cannon's fiduciary duty, and even accepted such checks in payment of Cannon's personal loans to UAB. Furthermore, UAB would call Cannon, often daily, to warn of overdrafts in the escrow account. UAB allowed Cannon to make deposits to cover the overdrafts rather than returning the checks, and would provide him same day credit, enabling him to cover overdrafts in the account with worthless funds and hide his misappropriation. Additionally, the plaintiffs assert that UAB wrote to the Tennessee Board of Professional Responsibility on Cannon's behalf to cover up his misconduct. These actions, together with the revolving line of credit to cover shortages in the escrow account, enabled Cannon to stay in business and perpetuate his scheme of fraud and misappropriation. UAB officers admitted that without these services to Cannon, his business would have shut down, and that prediction was borne out when UAB finally discontinued its flexible policies. Unlike *Patton*, in which the nature of the act encouraged was the continuation of a lawful business as opposed to a tort, *see* 1992 WL 183064, at *12, here the acts allegedly encouraged were fraud and misappropriation. Although UAB normally has no duty to monitor an escrow account, where it has notice that the fiduciary is breaching its duties with respect to the account, the bank cannot continue to provide assistance and willfully ignore the breach to its own benefit. *See Restatement (Second) of Torts* § 874 comment c ("A person who knowingly assists a fiduciary in committing a breach of trust is himself guilty of tortious conduct and is subject to liability for the harm thereby caused. (See § 876).").

To the extent that *Pereira* held, under rather similar facts, that similar conduct was insufficient to constitute substantial assistance, this court disagrees. The *Pereira* court found that as long as the bank was

motivated by the lawful goal of generating fees rather than sharing the intent of the primary wrongdoer, the bank's provision of flexible banking services was simply insufficient to constitute substantial assistance. 201 B.R. at 671–72 (citing *Landy v. Federal Deposit Ins. Corp.*, 486 F.2d 139, 163 (3d Cir.1973)). Such an approach, however, allows a bank to knowingly profit from misappropriation. UAB's policies and actions with respect to the escrow account enabled Cannon to perpetuate his scheme. If done with actual knowledge of Cannon's breach of duty, a reasonable juror could determine that UAB substantially assisted Cannon's misdeeds. *See Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 999 (S.D.N.Y.1991) (finding that plaintiff stated a claim of aiding and abetting a breach of fiduciary duty where plaintiff alleged that directors' approval and participation in leveraged buyout constituted a breach of fiduciary duty, the bank knew of the breach, and the bank "substantially assisted the directors in their wrongful conduct by providing bridge loans knowing that the proceeds were being used for the purchase of stock ... as a result of which [the plaintiff] received no fair consideration for its assumption of the bridge loan obligations"); *Tubbs v. United Central Bank, N.A.*, 451 N.W.2d 177, 184 (Iowa 1990) (upholding district court's determination that there was insufficient evidence of substantial assistance, but nevertheless stating that where a bank provided another bank with liquidity, extending to it millions of dollars in credit which enabled a bank officer to continue misappropriating bank money, "there was evidence from which the fact finder could conceivably have found substantial assistance by [the defendant]"); *cf. Kelly v. Central Bank & Trust Co.*, 794 P.2d 1037, 1044 (Colo.Ct.App.1989) (distinguishing between "normal banking services" and commercially unreasonable handling of checks and finding that failure of bank to inquire about deposits into third parties' accounts of checks endorsed by a corporate payee precluded summary judgment on bank's reckless substantial assistance to fraudulent scheme under Colorado statute); *Judson v. Peoples Bank & Trust Co.*, 25 N.J. 17, 134 A.2d 761, 767 (1957) (citing § 876(b) and finding that a bank participated in misconduct where the bank knew that corporate assets were being used for the personal advantage of the president and directors and still furnished funds which enabled them to defraud shareholders).

Although not directly on point, *Hartford Accident & Indemnity Co. v. Farmers National Bank*, 24 Tenn.App. 699, 149 S.W.2d 473 (1940), which considered a bank's role in a breach of fiduciary duty by cashing and accepting checks drawn on a trust account, supports the proposition that UAB's conduct might constitute substantial assistance to Cannon. In *Hartford*, the court stated:

> [I]f the bank with such notice [of misappropriation] pays the fiduciary's check and thus aids him in the accomplishment of his unlawful purpose it participates in his breach of trust and is liable for his misappropriations.
>
> .... For instance, allowing the fiduciary to deposit known trust funds to his individual account and then to disburse the funds for his own personal use by his individual checks to third persons has been held sufficient to charge the bank with participation in the breach of trust. Though this is not sufficient where the bank has no notice that such checks are given for nontrust purposes. The bank's receipt of such trust monies in payment of the trustee's own personal indebtedness to the bank, makes the bank a participator in the breach of trust.

*Id.* at 476–77 (citations omitted). Thus, the court in *Hartford* held that the fiduciary and the bank "joined in treating this account as if it had been the personal account" of the fiduciary, and the bank was properly held liable for participating in breaches of trust by which misappropriations were accomplished. *Id.* at 477. Although it does not involve a claim for aiding and abetting under *Restatement* § 876(b), *Hartford* nevertheless indicates that knowingly honoring and accepting checks drawn in breach of fiduciary duty is sufficient to participate in that breach and, together with other conduct, may constitute substantial assistance. *Cf. United States Fidelity & Guar. Co. v. Union Bank & Trust Co.*, 228 F. 448, 451 (6th Cir.1915) ("[I]f the bank, out of this [trust] fund, either satisfied

its debt against the clerk personally, or affirmatively and intentionally aided him in wrongfully appropriating it to his own use, a liability therefor accrued in equity against the bank in favor of the beneficiaries." (subrogation action seeking an accounting against the bank)).

■ Accordingly, the court rejects the reasoning of *Pereira* that a bank's honoring of checks drawn in breach of a fiduciary duty and flexible banking services, such as notifying the customer of overdrafts and allowing the customer to cover those overdrafts with accelerated credit on uncollected funds, is insufficient as a matter of law to constitute substantial assistance. Rather, such actions, if done with the knowledge that the funds were misappropriated, and which enabled the fiduciary to continue deceiving other individuals, could be considered sufficient to have aided and abetted the breach of fiduciary duty, fraud, and misappropriation. The alleged conduct, however, raises a question of fact as to whether UAB substantially assisted Cannon, precluding a grant of summary judgment in favor of the plaintiffs.

### 2. Direct Claim of Aiding and Abetting

■ The plaintiffs assert that they are also bringing an independent claim of aiding and abetting against UAB based on Cannon's misrepresentations to Lawyers Title and First American. The plaintiffs claim they relied on Cannon's false representations, inducing them to issue title insurance policies and closing protection letters that they otherwise would not have issued. If the plaintiffs reasonably relied to their detriment on Cannon's misrepresentations and suffered damages as a result of their reliance, they would have a claim for fraud against Cannon separate from their subrogated claim. While the subrogated claim is based on the insureds' claims against Cannon for misappropriation, the direct claim is based on the fact that but for Cannon's false certifications to the plaintiffs, the plaintiffs would not have issued title insurance policies and closing protection letters that exposed them to liability. *Cf. Safeco Title Ins. Co. v. Attorneys' Title Servs., Inc.*, 460 So.2d 518, 520 (Fla.Dist.Ct.App. 1984) (finding that a title insurance company has a direct claim against a negligent abstracter hired by the insured, where the abstracter knew or should have known the title company was relying on the abstract, even where the title insurer has not reimbursed the insured for loss incurred due to the negligently prepared abstract).

Although the plaintiffs have alleged wrongful conduct by Cannon, they have failed to allege that UAB had actual knowledge of that conduct. The plaintiffs allege that UAB knew of Cannon's fiduciary relationship with the insureds and his misappropriation of their funds. That knowledge, however, does not indicate that UAB knew of Cannon's relationship with Lawyers Title or First American, or that he was falsely certifying to them that he had paid off mortgages and properly handled clients' funds. Although Cannon's misappropriation of funds may have given UAB knowledge of the breach of fiduciary duty, it does not necessarily give knowledge of any fraud with respect to the plaintiffs. Because the basis of the plaintiffs' claim is their reliance on these misrepresentations, UAB would have to have had knowledge of Cannon's misrepresentations to the plaintiffs. Due to the plaintiffs' failure to allege such knowledge, an essential element of their direct claim for aiding and abetting is lacking. Accordingly, the defendant's motion to dismiss the claim of aiding and abetting is granted to the extent of the plaintiffs' direct cause of action against UAB.

### B. Violation of Tenn.Code Ann. § 47–3–304

Lawyers Title and First American allege that UAB is liable under Tennessee's Uniform Commercial Code ("UCC") for checks drawn by Cannon on the escrow account in breach of his fiduciary duty. Specifically, the plaintiffs assert that because UAB had knowledge that Cannon was misappropriating funds from the account, under Tenn.Code Ann. § 47–3–304, UAB took those checks subject to the claims of the plaintiffs' insureds.

In support of this argument, the plaintiffs have alleged that UAB had knowledge that Cannon was a fiduciary because the account was labeled as an escrow account. Further-

more, on two occasions, UAB responded to papers regarding garnishment of the account, stating that as an escrow account, it was not subject to garnishment, thus recognizing that the funds were being held in trust for others. Additionally, the plaintiffs assert that because the checks were handwritten as opposed to machine-generated, and because they were payable to UAB or third parties for Cannon's personal debts, the checks were suspicious on their face and put UAB on notice that they were drawn in breach of Cannon's fiduciary duty. The plaintiffs further contend that UAB had notice with respect to each check because it either received it as the payee, or manually reviewed it as part of its standard operating procedure. The plaintiffs thus argue that UAB knew Cannon was misappropriating funds and that such knowledge prevents them from taking the checks as a holder in due course. Accordingly, they assert, UAB took the checks subject to those claims of which they had notice.

In response, UAB asserts that § 47–3–304 is inapplicable as a matter of law because Cannon and UAB were not in a fiduciary relationship vis-á-vis each other and UAB had no heightened duty with respect to the account. Alternatively, UAB argues that it was not a purchaser of checks made payable to Cannon or third parties, and thus cannot be held liable under § 47–3–304 for those checks. Accordingly, UAB asserts that this claim should be dismissed.

Under Tenn.Code Ann. § 47–3–305, a holder in due course takes an instrument "free from all claims to it on the part of any person and all defenses of any party except the enumerated 'real defenses.'" *McConnico v. Third Nat'l Bank,* 499 S.W.2d 874, 880 (Tenn.1973). Tenn.Code Ann. § 47–3–302 defines a holder in due course as a holder who took the instrument for value, in good faith, and without notice that it is overdue or has been dishonored, or of any defense against or claim to it on the part of any person. Under Tenn.Code Ann. § 47–3–304,

> [t]he purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty.
>
> · · · · ·
>
> Knowledge of the following facts does not of itself give the purchaser notice of a defense or claim: ... that any person negotiating the instrument is or was a fiduciary ....

Tenn.Code Ann. § 47–3–304(2), (4)(e).[7]

A "purchaser" is someone who takes by "purchase," which includes taking by negotiation. Tenn.Code Ann. § 47–1–201(32), (33). "Negotiation" is defined as "the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order it is negotiated by delivery with any necessary endorsement; if payable to bearer it is negotiated by delivery." Tenn.Code Ann. § 47–3–202(1). Furthermore, a "holder" is a "person who is in possession of a document of title or an instrument or a certified investment security drawn, issued or endorsed to him or to his order or to bearer or in blank." Tenn.Code Ann. § 47–1–201(20).

■ Initially, UAB's first argument—that it cannot be held liable because Cannon was not a fiduciary with respect to UAB—must fail based on the language of the statute. The statute merely provides that the person owe a fiduciary duty to someone, and that the defendant had knowledge of that

---

**7.** Tennessee's UCC and § 47–3–304 in particular were amended in 1995. The UCC clarifies the law previously addressed in § 47–3–304 by stating more clearly and comprehensively the rules regarding a taker's notice of a breach of fiduciary duty with respect to an instrument. Tenn. Code Ann. § 47–3–307 cmt.1. Because the amendments were not in effect during the relevant time period, nor when the case was filed, the court will not apply § 47–3–307 in determining these motions. Rather, the court will apply § 47–3–304, as that was the statute in effect when this suit was filed. *See Wakefield v. Crawley,* No. 03A01–9707–CH–00290, 1998 WL 249061, at *3 (Tenn.Ct.App. May 19, 1998) (noting the 1995 amendments to the UCC and examining Tenn.Code Ann. § 47–8–102 as it existed prior to the 1995 amendments to that section). Additionally, all references to the Tennessee Code Annotated will be to the Code prior to the 1995 amendments.

duty. Nowhere does the statute require that the fiduciary relationship be between the defendant and the fiduciary. Indeed, the logical interpretation of § 47–3–304 is that it contemplates a fiduciary duty owed to a third party, of which the defendant knew; it is the defendant's acceptance of an instrument, despite its knowledge of the duty that subjects it to the third party's claim. *See Soloff v. Dollahite,* 779 S.W.2d 57, 59–60 (Tenn.Ct. App.1989) (considering whether bank had knowledge that fiduciary was negotiating check in violation of fiduciary duty and stating that "without knowledge that the fiduciary is committing a breach of *his* duty, the mere form of the transaction will not affect the transferee's status as a holder in due course" (emphasis added)); *see also McConnico,* 499 S.W.2d at 886 (considering claims under § 47–3–304 and whether defendant bank had knowledge or notice "that a fiduciary was negotiating the instruments for his own benefit and in violation of his duty").

Although UAB may not have had any additional monitoring duties with respect to the account, Cannon owed a duty to the insureds. Furthermore, UAB's arguments that the account was merely a general deposit rather than a fiduciary one are disingenuous in light of its own recognition of the account as an escrow account, both by allowing Cannon to style it that way, and by refusing to garnish the account on the basis that it was an escrow account. Thus, UAB's own actions indicate that it considered Cannon to be a fiduciary with respect to those funds. Accordingly, UAB's motion to dismiss the plaintiffs' claim on this basis is denied.[8]

UAB's second contention, however, that it is *not* liable for checks for which it was merely the drawee bank, is correct. In order to be held liable for the checks drawn in violation of Cannon's duty pursuant to § 47–3–304, the defendant must have been a purchaser of the checks. Under Tennessee law, however, a drawee bank is not a purchaser of checks.[9] In *Figuers v. Fly,* 137 Tenn. 358, 193 S.W. 117 (1916), the Supreme Court of Tennessee held that presentation of a check to a drawee bank for payment is not a "negotiation" of that check. *Id.* at 377, 193 S.W. 117 (interpreting "negotiation" under the Negotiable Instruments Law); *see Farmers' & Merchants' Bank v. Bank of Rutherford,* 115 Tenn. 64, 71, 88 S.W. 939 (1905) ("The drawee is not a holder in due course. . . . A holder means a payee or indorsee who is in possession, or the bearer. . . . The drawee, when he accepts the check, makes himself the guarantor thereof."); *see also Central Bank & Trust Co. v. General Fin. Corp.,* 297 F.2d 126, 128 (5th Cir.1961) ("The drawee of a check payable to another is neither a payee or indorsee. It is not a holder and hence is not a holder in due course.") (applying the Negotiable Instruments Law); *Security Sav. Bank v. First Nat'l Bank,* 106 F.2d 542, 545 (6th Cir.1939) ("[U]nder the Negotiable Instruments Law, the drawee does not become a holder, nor do presentation and payment constitute negotiation. . . . "); *First Nat'l Bank v. United States Nat'l Bank,* 100 Or. 264, 197 P. 547, 555 (1921) ("[P]resentment to the drawee for payment is not a negotiation of a check . . . . It is manifest that a drawee, who pays a check and then receives it as a cancelled voucher . . . is not 'a holder' . . . .").[10]

---

8. Additionally, the court notes UAB's failure to cite any case law whatsoever with respect to this argument. Instead, the defendant cited a string of cases holding that the mere title of an account as an "escrow account" does not impose a heightened duty upon the bank. While this may be so, none of these cases establish that the defendant and the misappropriater must be in a fiduciary relationship in order to impose liability under Tenn.Code Ann. § 47–3–304.

9. Lawyers Title and First American cite *Bank of Wyandotte v. Woodrow,* 394 F.Supp. 550 (W.D.Mo.1975), for the proposition that a drawee bank can be a purchaser. Because that case deals with a depositary bank, it is inapplicable here.

10. Although these cases deal with negotiation under the Negotiable Instruments Law, the definition of negotiation was substantially similar to the one in Tenn.Code Ann. § 47–3–202. *See First Nat'l Bank,* 197 P. at 555 ("An instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof."). In the absence of Tennessee cases construing § 47–3–202 with respect to a drawee bank, the court finds these cases instructive.

Therefore, UAB cannot be held liable under § 47–3–304 for those checks for which it was merely the drawee bank. Nevertheless, this does not provide the defendant with as broad a defense as it asserts. Although UAB claims that the above reasoning prevents them from being liable for any checks payable to third parties or to Cannon, UAB was not merely the drawee bank for some of those checks. Rather, with respect to many checks, it was the depositary bank as well.[11] Accordingly, it is necessary to categorize the checks at issue in light of UAB's status with respect to each of them. Upon review of the plaintiffs' allegations, four categories of checks emerge: (1) checks drawn to transfer funds from the escrow account to Cannon's personal account; (2) checks made payable to J.C. Bradford & Co. for commodity trades, which J.C. Bradford then deposited in its account at UAB; (3) checks drawn on the escrow account made payable to third parties, including Cannon's wife, the Memphis Country Club, Southern Methodist University, and various businesses, some of which Cannon owned; and (4) checks drawn on the escrow account, made payable to UAB to cover payments on Cannon's personal loans at the bank.

With respect to the first type of checks—those written by Cannon to transfer funds from the escrow account to his personal account—and the second type—those checks made payable to J.C. Bradford, which J.C. Bradford in turn deposited in its account at UAB—UAB would be the depositary bank as well as the drawee bank. Accordingly, in such cases, UAB would have received the check by negotiation; those checks were made payable to order, and then endorsed either to UAB, or in blank.[12] As a result, UAB is a purchaser of those checks, and is subject to liability under § 47–3–304. With respect to the third category, however, i.e., those checks written to third parties which were not presented to UAB for deposit or for

cash, UAB was merely the drawee bank, and therefore, cannot be held liable under § 47–3–304. As discussed above, mere presentment to the drawee for payment does not result in a negotiation. Thus, it was not a purchaser of those checks, and § 47–3–304 would not apply. Finally, with respect to those checks drawn on the escrow account and made payable to UAB for payments on Cannon's loans, UAB was clearly a purchaser of such checks, because as payee, it received the funds and issued a credit to Cannon's loan in exchange. In fact, UAB does not dispute that it was a purchaser of these checks.

Therefore, UAB's motion to dismiss the claim for violation of § 47–3–304 is denied with respect to all checks except those for which UAB was merely the drawee bank, i.e., those checks that were not made payable to UAB, not deposited with UAB, nor negotiated to UAB for payment.

In determining whether to grant the plaintiffs' motion for summary judgment on this claim, however, it is necessary to consider whether UAB took those checks of which it was a purchaser with actual knowledge that the checks were drawn in breach of a fiduciary duty.

In *McConnico v. Third Nat'l Bank*, 499 S.W.2d 874, 882 (Tenn.1973), the Supreme Court of Tennessee stated: "without actual knowledge, either at the time of deposit or at the time of payment of personal debt, that [funds were being used in breach of a fiduciary duty] ... the defendant bank neither [has] notice as required by T.C.A. § 47–3–304(2) nor [is] its conduct so outrageous that it points to dishonesty or bad faith so as to defeat the defendant bank's status as a holder in due course." *Id.* In *Soloff v. Dollahite*, the Tennessee Court of Appeals found that, even though, "[o]n the surface, the facts seem to show that the bank clearly has notice

---

**11.** A "depositary bank" is "the first bank to which an item is transferred for collection even though it is also the payor bank." Tenn.Code Ann. § 47–4–105(a). Unlike a mere drawee bank, a depositary bank, or a collecting bank, gains an interest in the instrument to the extent that it paid funds or advanced credit against the item. Tenn.Code Ann. § 47–4–208.

**12.** "An endorsement in blank specifies no particular endorsee and may consist of a mere signature. An instrument payable to order and endorsed in blank becomes payable to bearer and may be negotiated by delivery alone until specially endorsed." Tenn.Code Ann. § 47–3–204.

of a possible claim against the instrument," "without actual knowledge that the fiduciary is committing a breach of his duty, the mere form of the transaction will not affect the transferee's status as a holder in due course." 779 S.W.2d 57, 59–60 (Tenn.Ct.App.1989).

Plaintiffs allege that UAB had actual knowledge that the checks it received were drawn in breach of Cannon's fiduciary duty. In large part, their argument rests on the assertion that the checks UAB received and reviewed indicated, on their face, that they were written in breach of Cannon's fiduciary duty. Nevertheless, drawing all inferences in favor of UAB, the evidence is insufficient at this point for a determination as a matter of law in favor of the plaintiffs.

UAB asserts that although it experienced problems with Cannon consistently overdrawing the account, the bank had no knowledge that he was breaching his duty and misappropriating the funds. As noted above in the discussion of aiding and abetting, a genuine issue of material fact exists as to UAB's knowledge of Cannon's misappropriation of the funds. *See supra* part IV.A. Furthermore, the review of each check to which the plaintiffs refer was assertedly a cursory review of the authenticity of the maker's signature against the account's signature card, which is performed on every check received by the bank, regardless of amount. UAB notes that this procedure involves several thousand checks per day, and is performed by "low-level clerks who . . . do not examine the checks for any other purpose." Thus, this procedure may not have given UAB knowledge of the misappropriation. Accordingly, the plaintiffs' motions for summary judgment with respect to Tenn. Code Ann. § 47–3–304 are denied.

### C. *Common Law Causes of Action*

The plaintiffs assert several common law causes of action, including unjust enrichment and restitution, constructive trust, and money had and received. Essentially, all three causes of action are premised on the same factual allegations. Lawyers Title and First American assert that UAB's knowledge and assistance of Cannon's misappropriation render its receipt and retention of funds in payment of loans or as servicing fees on the account unjust. Therefore, they assert, those funds should be returned to Lawyers Title and First American, as subrogees of their insureds. In response, UAB asserts that it had no knowledge of Cannon's illegal use of funds, and that it was entitled to the fees because it provided consideration in the form of servicing the account. Thus, UAB argues, its receipt of the funds was not wrongful, and it should not have to turn them over to the plaintiffs. Additionally, UAB asserts that it should not have to return the money to the plaintiffs because neither of the plaintiffs gave the money to UAB, and the parties were not in privity with each other. Although similar, each cause of action has its own requirements; accordingly, the court will address each in turn.

### 1. *Unjust Enrichment and Restitution*

In order to state a claim for unjust enrichment under Tennessee law, a plaintiff must show "[a] benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 155 (1966); *see also Ergon, Inc. v. Amoco Oil Co.*, 966 F.Supp. 577, 586 (W.D.Tenn.1997) (listing the elements enumerated in *Paschall's*). Thus, "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Browder v. Hite*, 602 S.W.2d 489, 491 (Tenn.Ct.App.1980). In order to withstand a motion for summary judgment with respect to a claim for unjust enrichment, "there must be genuine issues of material fact as to whether 1) [the plaintiff] conferred a benefit on [the defendant]; 2) [the defendant] appreciated the benefit; and 3) whether it would be inequitable for [the defendant] to retain the benefit without paying for it." *B & L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 680 (Tenn. Ct.App.1995) (involving a claim that the defendant was unjustly enriched because his wrongful acts allowed him to usurp plaintiff's clients). In establishing a claim, "[t]he most significant requirement for a recovery . . . is

that the enrichment to the defendant be unjust." *Paschall's,* 407 S.W.2d at 155.

Tennessee courts have yet to rule on whether a plaintiff must directly confer a benefit on the defendant in order to state a claim for unjust enrichment. However, the Sixth Circuit's opinion in *Black v. Boyd,* 248 F.2d 156 (6th Cir.1957), compels this court to conclude that under the facts alleged, the plaintiffs have not stated a claim for unjust enrichment.

In *Black,* the bank extended a loan to the Milling Company. By means of a fraudulent sale, the Milling Company obtained money from Continental, which the Milling Company then transferred to the bank in payment of its loans. In considering the nature of Continental's claim against the bank due to the bank's receipt of Continental's funds, the Sixth Circuit stated:

> It is true ... that [Continental] seeks recovery from a solvent defendant of a sum certain, ... [b]ut it does not follow that these facts make it an action at law based upon the theory of quasi-contract arising out of unjust enrichment.
>
> Continental has no quasi-contractual cause of action against the Bank based on unjust enrichment at its expense. The transaction complained of was not between Continental and the Bank. The payment of money which Continental seeks to recover was not made by Continental to the Bank, but was made to the Milling Company. The Bank has not been unjustly enriched by reason of any transaction between it and Continental. Nor did its transaction with the Milling Company result in any unjust enrichment at the expense of that company, which received credit on its undisputed obligation, dollar for dollar. If the transaction stands, the Bank has merely been repaid money which it previously loaned to the Milling Company, which is not the 'unjust enrichment' required as the basis of a quasi-contractual obligation.

248 F.2d at 162; *see also Leeper v. Cook,* 688 S.W.2d 94, 96 (Tenn.Ct.App.1985) (affirming dismissal of an unjust enrichment claim because "no obligation arose between the parties because there is no privity nor transactions between the parties establishing a basis

for either a legal or equitable obligation the one to the other."). Under the reasoning of *Black,* the plaintiffs have not stated a claim for unjust enrichment against UAB; "[UAB] has not been unjustly enriched by reason of any transaction between it and [the plaintiffs' insureds]." 248 F.2d at 162. Accordingly, the defendant's motion to dismiss this claim is granted.

### 2. *Constructive Trust*

■■■■ Tennessee courts have recognized four scenarios in which a constructive trust will be imposed:

> 1) where a person procures the legal title to property in violation of some duty, express or implied, to the true owner; 2) where the title to property is obtained by fraud, duress or other inequitable means; 3) where a person makes use of some relation of influence or confidence to obtain the legal title upon more advantageous terms than could otherwise have been obtained; and 4) where a person acquires property with notice that another is entitled to its benefits.

*Intersparex Leddin KG v. Al–Haddad,* 852 S.W.2d 245, 249 (Tenn.Ct.App.1992). A constructive trust will not "be imposed against a party who receives property in good faith and without notice of an adverse claim." *Id.* at 249. Instead, "[a] constructive trust may only be imposed against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment or questionable means, has obtained an interest in property which he ought not in equity or in good conscience retain." *Id.* (citing *Livesay v. Keaton,* 611 S.W.2d 581, 584 (Tenn.Ct.App.1980)); *see Continental Grain Co. v. First Nat'l Bank,* 162 F.Supp. 814, 833 (W.D.Tenn.1958) (finding that a constructive trust cannot be imposed against a bank which received money in good faith and without notice of an adverse claim); *see also Restatement of the Law of Restitution* § 201(1) ("Where a fiduciary in violation of his duty to the beneficiary transfers property or causes property to be transferred to a third person, the third person, if he gave no value or if he had notice of the violation of

duty, holds the property upon a constructive trust for the beneficiary.").

■ In the instant case, the plaintiffs have alleged that UAB received funds with knowledge that they were being held in trust for various mortgage lenders; this allegation falls within the fourth basis for imposition of a constructive trust, listed above. Accordingly, the plaintiffs have sufficiently stated a claim to withstand UAB's motion to dismiss. As discussed, *supra*, however, genuine issues of material fact exist as to whether UAB knew not only that the funds were held in trust, but also that they were being misappropriated. Viewing the evidence in the light most favorable to UAB, there is a factual dispute as to whether UAB had such knowledge. Accordingly, the plaintiffs' motions for summary judgment with respect their request for a constructive trust are denied.

### 3. *Money Had and Received*

■ Under Tennessee law, an action for money had and received "is maintainable in all cases where one person has received money or its equivalent under such circumstances that in equity and good conscience he ought not to retain it and ex aequo bono it belongs to another." *Interstate Life & Accident Co. v. Cook*, 19 Tenn.App. 290, 86 S.W.2d 887, 891 (1935) (citation omitted); *Steelman v. Ford Motor Credit Co.*, 911 S.W.2d 720, 724 (Tenn.Ct.App.1995) ("An action for money had and received … may be maintained where one receives money or its equivalent under such circumstances that in equity and good conscience he ought not to retain and in justice and fairness it belongs to another." (citing *Interstate Life & Accident* )). Thus, the issue is whether the circumstances were such so as to render it unjust as a matter of law based on undisputed facts for UAB to retain money received from Cannon out of the escrow account.

UAB argues that it was entitled to receive the funds because it provided consideration in the form of servicing Cannon's account, and therefore, its receipt of the monies was not unjust. The defendant seems to misunderstand the plaintiffs' argument. The plaintiffs do not assert that UAB's mere receipt of

the funds was unjust, but rather, that UAB's knowledge that the funds were misappropriated rendered its receipt of them wrongful, regardless of any consideration that UAB may have provided. Determination of the claim turns on whether UAB had knowledge of the misappropriation. The plaintiffs argue not only that UAB knew that Cannon was misappropriating funds, but that UAB was affirmatively aiding Cannon in his actions. *See supra* part IV.A. (discussing plaintiffs' claim for aiding and abetting). If such a claim is established, the plaintiffs could show that UAB received money that belonged to the plaintiffs' insureds, as a result of UAB's own wrongful actions which aided Cannon in misappropriating the funds UAB received. Such actions would render UAB's receipt and retention of the funds unjust. *See Dickson v. Cunningham*, 8 Tenn. 203, 221 (1827) (permitting plaintiff to recover money in an action for money had and received where the defendant's fraudulent actions resulted in his receipt of the plaintiff's money). Therefore, these allegations are sufficient to state a claim for money had and received; accordingly, UAB's motion to dismiss this claim is denied.

■ Nevertheless, genuine issues again remain with respect to UAB's knowledge of Cannon's misappropriation, as well as the extent of its participation, if any, in that illegal activity. It follows, therefore, that summary judgment in favor of the plaintiffs on this claim is inappropriate. Thus, the plaintiffs' motions for summary judgment on the issue of money had and received are denied.

### D. *Tenn.Code Ann. § 47–4–302*

■ Lawyers Title asserts that UAB is strictly liable to it for returning checks after the midnight deadline had passed in violation of Tenn.Code Ann. § 47–4–302. UAB admits that the checks were, in fact, returned after the deadline, but argues that Lawyers Title, as a subrogee, has no standing to assert such a claim. In response, Lawyers Title argues that UAB should be held liable for this violation because Lawyers Title suffered damages as a result of UAB's actions, and it would be inequitable not to subject UAB to liability in

light of the assistance it allegedly provided to Cannon over the course of several years.

Tenn.Code Ann. § 47–4–302 provides:

> In the absence of a valid defense such as breach of a presentment warranty (§ 47–4–207(1)), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of: (A) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depository bank, retains the item beyond midnight (12:00) of the banking day of receipt without settling for it or, regardless of whether it is also the depository bank, does not pay or return the item or send notice of dishonor until after its midnight deadline.

Tenn.Code Ann. § 47–4–302(a). The "midnight deadline" is defined as "midnight on [the bank's] next banking day following the banking day on which it receives the relevant item ...." Tenn.Code Ann. § 47–4–104(10). Under § 47–4–302, a bank is strictly liable for the face amount of the check for failure to comply with the deadline, regardless of whether any damages are suffered. *Yeiser v. Bank of Adamsville*, 614 S.W.2d 338, 341–42 (Tenn.1981). The statute, however, is unclear as to who may bring an action to enforce § 47–4–302. The purpose of § 47–4–302 is to state "the rights of the customer if the payor bank fails to take the action required within the time limits prescribed." Tenn.Code Ann. § 47–4–302 (official comments). Although "customer" is defined as "a person having an account with a bank or for whom a bank has agreed to collect items, including a bank that maintains an account at another bank," this definition does not indicate whether a subrogation claim may be brought under § 47–4–302. Tenn.Code Ann. § 47–4–302.

To date, only one court has addressed the issue presented, i.e., whether a subrogee has standing to bring a claim for violation of the midnight deadline. The court in *American Title Ins. Co. v. Burke & Herbert Bank & Trust Co.*, 813 F.Supp. 423 (E.D.Va.1993), *aff'd without opinion*, 25 F.3d 1038 (4th Cir. 1994), upon which UAB relies heavily,[13] addressed this exact issue, with facts quite similar to those at bar. Due to the similarity between the cases, an overview of *American Title* is useful.

In *American Title*, the plaintiff had issued title policies, commitments, and endorsements through authorized agents in connection with the sale of real estate in Virginia. *Id.* at 425. Its agent in Virginia maintained an account in which the clients' funds, entrusted to the agent for closing purposes, were deposited until disbursement to the appropriate parties. *Id.* Unbeknownst to both the bank and American Title, the agent corporation's vice-president was embezzling funds from the escrow account for an extended period of time. *Id.* Eventually, checks were written that, upon debit from the account, caused the account to be overdrawn. *Id.* Relying upon the vice-president's assertions that the overdraft would be covered, the bank did not return the checks. Eventually, however, the bank, realizing that no funds were forthcoming, finally returned the checks to the payees stamped "insufficient funds," after the midnight deadline had long passed—four days late with respect to some checks, and eight days late with respect to others. *Id.* As provided in closing protection letters that American Title had issued in connection with real estate closings, American Title was required to pay its insureds for the losses resulting from the returned checks due to the fraud and dishonesty on the part of its authorized agent. *Id.* at 426. Subsequently, American Title brought an action

---

**13.** UAB also relies on *Bon Bon Prods., Ltd. v. Xanadu Prods., Inc.*, 32 UCC Rep. Serv. 253 (D.Mass. Sept.17, 1981), as support for the proposition that Lawyers Title has no standing with respect to this claim. *Bon Bon*, however, does not involve the same issue as that presented here. In *Bon Bon*, the only connection between the plaintiff and the late return was that the check on which the plaintiff was the payee was returned for insufficient funds due to the late return and charge back of a different check; the court found this connection "too tenuous" to support an action for violation of the midnight deadline. Unlike the plaintiff in *Bon Bon*, however, the parties from whom the plaintiffs' subrogation rights derive were payees of the checks that were returned past the deadline and the plaintiffs are bringing a claim by way of subrogation. Thus, *Bon Bon* does not directly address this question.

against the bank, seeking to recover the losses incurred as a result of the late return of the checks, asserting a violation of Va.Code § 8.4–302, Virginia's equivalent to § 47–4–302, as the holder, transferee, and assignee of the returned checks, as well as under principles of equitable subrogation. *Id.*

After recognizing that § 8.4–302 and other states' equivalent statutes impose strict liability for returning a check after the midnight deadline, even if the party suffers no loss, the court found that American Title nevertheless had no standing to bring such a claim. The *American Title* court focused on the purpose of the rule which is to facilitate commerce by imposing time limits within which the payor bank must act; "[w]ithout these strict time limits, the dependent chain of credit created by presentment of a check would threaten the efficient operation of the banking industry." *Id.* at 428. Thus, the court found that although the benefit accrues to the general public, the general public does not have standing to sue; rather, the "statute confers standing to sue on a limited class comprised of those involved in the collection and payment of the check at issue who may be directly harmed (but are not necessarily harmed) by the failure of the payor bank to adhere to the ... midnight deadline." *Id.* In sum, the court noted that standing to sue for violation of the midnight deadline is premised upon the party's "potential reliance on payor bank action once a check is actually presented." *Id.* Because American Title obtained the checks after the midnight deadline had been violated, it was not in a position to rely on bank action with respect to the checks and the policy behind § 8.4–302 would not be furthered by allowing American Title to pursue the action. *Id.* at 428–29.

Additionally, the court contemplated the meaning of "customer" under the statute. Finding that the definition was ambiguous in this context, the court nevertheless noted that the statute's official comments indicate that "some direct connection" between the

check collecting and payment process and the party seeking to bring suit must exist in order for the party to have standing. *Id.* at 428 n.5.

The court also rejected American Title's arguments that it was entitled to recover under principles of equitable subrogation. Rather, the court found:

> American Title paid the original payees for losses incurred because of [the agent's] fraud pursuant to its obligations under the Closing Protection letters it had issued in connection with real estate closings involving the original payees. While Burke & Herbert may have been liable under § 4–302 had these payees brought an enforcement action, its statutory liability is not, in any way, related to American Title's obligations to the payees under the Closing Protection letters. In fact, had Burke & Herbert timely dishonored the checks for insufficient funds, American Title would still have been obligated to reimburse the original payees for the losses resulting from [the agent's] embezzlement. That the original payees elected to pursue their rights against American Title under the Closing Protection letters, and did not to pursue [sic] the separate and independent alternative of suing Burke & Herbert under § 4–302, does not provide American Title with any equitable rights against Burke & Herbert. As such, the Court concludes that American Title cannot enforce payment for the face amount of the dishonored checks pursuant to principles of equitable subrogation.

*Id.* at 430. Thus, the court rejected American Title's claims under § 8.4–302.

Similarly, Lawyers Title had to pay money to its insureds as a result of UAB's return of checks in fulfillment of its obligations under closing protection letters it had issued. Lawyers Title presently asserts that, under principles of equitable subrogation, it is entitled to pursue its insureds' claims against UAB for violating Tenn.Code Ann. § 47–4–302.[14]

---

**14.** Lawyers Title bases its right of recovery on "the Uniform Commercial Code and principles of equitable subrogation." Although the policy it issued to its insured provided for subrogation to "all rights and remedies," Lawyers Title appears

not to rely on this policy as a basis for subrogation with respect to this claim. Nevertheless, it would not change the analysis; under the reasoning of the *American Title* court, Lawyers Title's connection to the check would still be insuf-

The court, however, finds the reasoning of *American Title* persuasive. Permitting a cause of action via subrogation fails to further the underlying purpose of the midnight deadline—certainty of business transactions and facilitation of commerce—because the interest asserted did not arise until after the deadline was violated. Furthermore, no basis for equitable subrogation exists, because as in *American Title*, Lawyers Title would have had to pay its insureds even if UAB had returned the checks prior to the midnight deadline. Lawyers Title's arguments that UAB should be punished for its alleged extensive assistance of Cannon's misappropriation, even if true, are not relevant to liability under § 47-4-302. Liability under that section is premised solely on whether checks were returned within a specific time period; other conduct of the bank does not bear on such a determination.

Thus, because Lawyers Title was not a party within the risk contemplated by the statute, that is, one who is in a position to rely on bank action, and has no basis for equitable subrogation, its connection with the checks at issue is too remote for it to bring an action under § 47-4-302. Accordingly, this court adopts the reasoning of the *American Title* court and finds that Lawyers Title has no standing to bring a cause of action as a subrogee under § 47-4-302. Therefore, UAB's motion to dismiss Lawyers Title's claim for violation of the midnight deadline is granted.

## VI. *PUNITIVE DAMAGES*

With respect to each of their claims, the plaintiffs request punitive damages as well. UAB argues in its motion to dismiss that the plaintiffs lack standing for such a claim because, as subrogees, they are entitled to indemnity only. In response, the plaintiffs concede that they are not entitled to punitive damages for their subrogation claims; nevertheless, they argue that their direct aiding and abetting claim entitles them to punitive damages. As discussed above, the plaintiffs' independent claim for aiding and abetting

has been dismissed for failure to allege actual knowledge of Cannon's misrepresentation. Therefore, the court turns to the question of whether the plaintiffs, as subrogees, are entitled to punitive damages.

■ The court agrees with the defendant, and apparently the plaintiffs as well, that punitive damages are unavailable in claims brought by subrogation. Although Tennessee courts have not yet ruled on this issue, the principles of subrogation and the case law of other jurisdictions are persuasive authority for the conclusion. As the court in *Utica Mut. Ins. Co. v. Denwat Corp.*, 778 F.Supp. 592 (D.Conn.1991), noted:

> The rule espoused by the courts that have addressed the issue is based on the accepted premise that because a subrogee's status is derivative, the subrogee is not entitled to achieve any greater rights than those which the subrogor would have been entitled.... As such, the subrogee "is entitled to indemnity only to the extent of the money actually paid to discharge the obligation."

*Id.* at 594 (quoting *Colorado Farm Bureau Mut. Ins. Co. v. CAT Continental, Inc.*, 649 F.Supp. 49, 52 (D.Colo.1986)). Because the Supreme Court of Tennessee has recognized that subrogation secures indemnity only, rather than assigning the entire claim to the subrogee, this reasoning with respect to punitive damages is equally applicable in Tennessee. *Wilson v. Tennessee Farmers Mut. Ins. Co.*, 219 Tenn. 560, 411 S.W.2d 699, 701 (1966) ("Subrogation means substitution, not assignment or transfer. Subrogation operates only to secure contribution and indemnity; whereas, an assignment transfers the whole claim."). As the plaintiffs do not dispute this conclusion, the plaintiffs' claims for punitive damages are dismissed.

## VII. *CONCLUSION*

In light of the foregoing, the defendant's motion to dismiss is granted in part and denied in part; the plaintiffs' motions for

---

ficient because it did not gain an interest in the check, if at all, until after late return. As the court in *American Title* found American Title's interest insufficient even where the insureds ne-

gotiated the checks to American Title, Lawyers Title's more remote connection stemming from a general subrogation provision in an insurance policy would be insufficient as well.

partial summary judgment are denied. The motion to dismiss is granted with respect to the plaintiffs' requests for punitive damages and the plaintiffs' claim for unjust enrichment and restitution. The motion to dismiss the plaintiffs' claim for violation of Tenn. Code Ann. § 47–3–304 is granted with respect to those checks for which UAB was merely the drawee bank. Additionally, Lawyers Title's claim for violation of Tenn.Code Ann. § 47–4–302 is dismissed due to lack of standing to assert such a claim. In all other respects, UAB's motion to dismiss is denied. Because genuine issues of material fact exist regarding UAB's knowledge of the misappropriation of the escrow funds which bears on all of the plaintiffs' remaining claims, their motions for summary judgment are denied in their entirety.[15]

---

**15.** In its answers to the plaintiffs' complaints, UAB asserted as an affirmative defense Tenn. Code Ann. § 35–2–111(c), which UAB asserts sets forth UAB's only duties relating to the escrow account. The plaintiffs moved to strike this affirmative defense, arguing that the Uniform Fiduciaries Act is not applicable to the UCC. On August 10, 1995, this court denied the motion to strike because the interplay between § 35–2– 111(c) and the UCC had not been fully developed and the plaintiffs had failed to adequately establish that the section could not apply. Accordingly, it remains an open issue as to whether UAB can assert § 35–2–111(c) as an affirmative defense. Because the plaintiffs' motions for summary judgment were denied in their entirety, however, the court need not address this issue at this time.